428 F.2d 623
 UNITED STATES of America ex rel. Nelson MINER, Appellant,
v.
Donald R. ERICKSON, as the duly appointed, qualified and acting Warden of the South Dakota State Penitentiary, Appellee.
 No. 19977.
 United States Court of Appeals, Eighth Circuit.
 June 5, 1970.
 
 C. L. Anderson, Sioux Falls, S. D., on brief for appellant.
 Gordon Mydland, Atty. Gen., Pierre, S. D., and R. James Zieser, Asst. Atty. Gen., on brief for appellee.
 Before BLACKMUN, GIBSON and LAY, Circuit Judges.
 BLACKMUN, Circuit Judge.
 
 
 1
 Nelson Howard Miner, who is an enrolled Cheyenne Indian now 47 years of age and a prisoner in the South Dakota penitentiary, filed his application for a writ of habeas corpus with the United States District Court for the District of South Dakota. He sought relief from his 1962 plea of guilty on a state charge of child molestation (two girls aged 6 and 4, respectively, who were nieces of Miner and also enrolled Cheyennes), in violation of S.D.Code of 1939 § 13.1727 (Supp. 1960)* — now S.D.Comp.Laws 1967 §§ 22-22-7 to -10. Chief Judge Nichol held a full hearing at which counsel appeared for Miner and at which Miner was the sole witness. The transcript of the 1962 state court arraignment and sentence and those of the 1966 and 1968 postconviction state proceedings, hereinafter referred to, were introduced in evidence. After the hearing Judge Nichol denied the application. United States ex rel. Miner v. Erickson, 303 F.Supp. 960 (D. S.D.1969). However, he issued the certificate of probable cause required by 28 U.S.C. § 2253. Miner appeals.
 
 
 2
 The molestation charge was lodged against Miner in March 1962. He was arraigned before Judge Leslie R. Hersrud in the Circuit Court of Dewey County, South Dakota, on March 28 and, without counsel entered his plea of guilty. With a presentence report showing many prior offenses by Miner, the court imposed a sentence of 15 years.
 
 
 3
 Four years later, in August 1966, Miner instituted post-conviction proceedings in the Circuit Court for Dewey County pursuant to South Dakota Session Laws 1966, ch. 121, now S.D.Comp. Laws 1967, ch. 23-52. Counsel was appointed for Miner. In that proceeding the arresting sheriff and a justice of the peace testified as to Miner's arrest, as as to their explaining his rights to him, and as to his being bound over to circuit court. Miner was not present and did not testify in person; an affidavit from him was submitted. Judge Hersrud made findings adverse to Miner on the issue of voluntary waiver of counsel. Relief was denied. There was no appeal.
 
 
 4
 In April 1968 Miner applied for a writ of habeas corpus in the same state court. Judge Hersrud held a full hearing at which new court-appointed counsel appeared for Miner and at which Miner, the justice of the peace, and the sheriff all testified. Again adverse findings were made on the waiver-of-counsel issue. Relief was denied. There was no appeal.
 
 
 5
 In January 1969 Miner sought habeas relief in the Circuit Court for Minnehaha County, South Dakota. Counsel was appointed and Miner testified. Again adverse findings, this time by Judge Burns, were made on the waiver issue. The application was denied. There was no appeal.
 
 
 6
 The present federal application was filed in April 1969.
 
 
 7
 On our own account we raise the question, as did Judge Nichol, whether state remedies have been exhausted, as 28 U.S.C. § 2254 requires, or have been deliberately bypassed. Miner was represented by a Dupree, South Dakota, attorney in the 1968 Dewey County proceeding. In connection with the federal hearing Miner produced copies of three letters he wrote from the penitentiary to this lawyer in June and September 1968. In these he expressed his desire to appeal the state habeas matter to the South Dakota Supreme Court and requested the attorney to take that step on his behalf. Wholly aside from any reason why the appeal was not taken, our examination of those letters convinces us that Miner did not deliberately bypass his right to appeal so as to bar the present federal proceeding. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).
 
 
 8
 We turn to the merits.
 
 
 9
 As Judge Nichol pointed out, 303 F.Supp. at 962, the sole question is whether Miner, when he submitted his plea of guilty at his arraignment in March 1962, knowingly and intelligently waived his right to counsel. We have carefully reviewed the transcript of that hearing before Judge Hersrud and we set forth in the Appendix the pertinent portions of the colloquy between Miner and the court.
 
 
 10
 In Miner's brief here it is acknowledged that Judge Hersrud "spent considerable time and effort advising Miner of his rights" and, indeed, "fully explained Miner's rights". The argument, however, is that on all Miner's previous criminal offenses, save one, he had had no lawyer; that on all he "received either small fines, short jail sentences, or suspended sentences" (he testified it was never more than 30 days); that Judge Hersrud did nothing to explain that molestation "was different from all of the other cases that Miner had been involved with" (he testified, "I didn't think I would be over in the penitentiary at all" and "I didn't know that I was going to get this much"); that no attorney was appointed to see that he understood this difference; that there was nothing "to show that Miner was alerted to the need for counsel any more * * * than in previous cases"; that, although he "had been in criminal court some 30 times" and in 1942 had served federal time, on "all other charges he paid a small fine or served a month or less in the County Jail"; that he had acquired "a learned or conditioned response" because he found that if he agreed with the judge and did not cause trouble, "he would get a light sentence" ("I said yes because that way he [the judge] wouldn't ask me any questions"); that the court this time "said the same things that the appellant had heard before when he received a light sentence"; that even the sheriff did not treat him differently, for he let him "out in the day and locked him up at night"; that this experience disarmed him; that Miner thus possessed no experience which he could use to advantage; that he "was less qualified to pass upon the issue of whether he should have a lawyer than a person with no experience"; that a lawyer would have been aware that Miner did not expect such a long sentence; that Miner did not fully understand the need for a lawyer; that he possessed limited education; and that the more serious the charge and the greater the sentence, the greater the defendant's need to understand.
 
 
 11
 As is common in these cases, no assertion is made here that Miner was innocent of the state crime with which he was charged.
 
 
 12
 The assistance of counsel at every critical stage of a felony proceeding pending in a state court is, of course, a cherished right. It is guaranteed by the sixth amendment and by that amendment's application to the states through the fourteenth amendment. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Mempa v. Rhay, 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed. 2d 336 (1967). It is guaranteed as well by the South Dakota Bill of Rights, S.D. Const., art. VI § 2 and § 7, and it is implemented as to indigents by S.D.Comp. Laws 1967 § 23-2-1 (Supp.1969) and § 23-35-11 or, at the time of Miner's sentence, by S.D.Code of 1939 §§ 34.1901 and 34.3506 (Supp.1960). Indeed, the Supreme Court of South Dakota, even prior to Gideon v. Wainwright, has repeatedly recognized and enforced this right. State v. Haas, 69 S.L. 204, 8 N.W.2d 569, 570 (1943); State ex rel. Henning v. Jameson, 71 S.D. 144, 22 N.W.2d 731, 732 (1946); State ex rel. Parker v. Jameson, 75 S.D. 196, 61 N.W. 2d 832, 833 (1953); State v. Hillerud, 76 S.D. 476, 81 N.W.2d 130, 131-132 (1957); State ex rel. Warner v. Jameson, 77 S.D. 340, 91 N.W.2d 743, 744 (1958); State ex rel. Stevenson v. Jameson, 78 S.D. 431, 104 N.W.2d 45 (1960); State ex rel. Burns v. Erickson, 80 S.D. 639, 129 N.W.2d 712, 715 (1964); In re Trevithick, 81 S.D. 121, 131 N.W.2d 440, 441 (1964); State ex rel. Pekarek v. Erickson, 155 N.W.2d 313, 314 (S.D.1967); State v. Buffalo Chief, 155 N.W.2d 914, 917 n. 1 (S.D.1968); State v. Goode, 171 N.W.2d 733, 734 (S.D.1969).
 
 
 13
 The right to counsel may be waived, of course, if the waiver is "made voluntarily and intelligently by a competent mind." State v. Haas, supra, 8 N.W.2d at 570; State v. Hillerud, supra, 81 N.W.2d at 132; State ex rel. Baker v. Jameson, 72 S.D. 638, 38 N.W.2d 441, 444 (1949); State ex rel. Warner v. Jameson, supra, 91 N.W.2d at 745; State v. Thomlinson, 78 S.D. 235, 100 N.W.2d 121, 122 (1960); In re Trevithick, supra, 131 N.W.2d at 441; S.D.Comp.Laws § 23-2-7 (1967); and S.D.Code of 1939 § 34.2905 (Supp.1960). All this echoes the general law. Carter v. Illinois, 329 U.S. 173, 67 S.Ct. 216, 91 L.Ed. 172 (1946); Escobedo v. Illinois, 378 U.S. 478, 490 n. 14, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Butler v. United States, 317 F.2d 249, 258 (8 Cir. 1963), cert. denied, 375 U.S. 836, 838, 84 S.Ct. 67, 77, 11 L.Ed.2d 65; Johnson v. United States, 318 F.2d 855, 856 (8 Cir. 1963); Minor v. United States, 375 F.2d 170, 172 (8 Cir. 1967), cert. denied, 389 U.S. 882, 88 S.Ct. 131, 19 L.Ed.2d 177.
 
 
 14
 The South Dakota court has gone so far as to say that a defendant has the constitutional right to waive counsel and to defend himself in person. State ex rel. Burns v. Erickson, supra, 129 N.W.2d at 716. On the other hand, the state court has emphasized the duty of the trial judge fully to advise a defendant of his rights. State ex rel. Henning v. Jameson, supra, 22 N.W.2d at 732; S.D. Comp.Laws 1967 § 23-35-19; S.D.Code of 1939 § 34.2302 (Supp.1960). It is said, too, that there is no presumption that a defendant charged with a felony and not represented by counsel understands his fundamental rights and waives them by a plea of guilty. "On the contrary, the courts indulge every reasonable presumption against such waiver." State ex rel. Henning v. Jameson, supra, 22 N.W.2d at 732-733; State ex rel. Warner v. Jameson, supra, 91 N.W.2d at 745.
 
 
 15
 The habeas applicant has the burden of proving that he did not waive his right to counsel. State ex rel. Warner v. Jameson, supra, 91 N.W.2d at 745.
 
 
 16
 It is a principle long established that whether there has been an intelligent waiver of the right to counsel depends upon the particular facts and circumstances of the case including the accused's background, experience, and conduct. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Von Moltke v. Gillies, 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948); In re Trevithick, supra, 131 N.W.2d at 441. Voluntariness or involuntariness usually is a question of fact. Johnson v. United States, supra, 318 F.2d at 856. See Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); Gallegos v. Colorado, 370 U.S. 49, 55, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); Jarrett v. United States, 423 F.2d 966 (8 Cir. 1970).
 
 
 17
 In commenting upon the desirability of appointment of counsel, the South Dakota court has stressed five things:
 
 
 18
 "We have in mind cases where the accused is young, inexperienced in criminal procedures; of questionable mental competency; lacking in education; or in any case where the gravity of the penalty or complexity of the crime seemingly dictates such procedure." State v. Thomlinson, 78 S.D. 235, 100 N.W.2d 121, 122 (1960).
 
 
 19
 These factors, or most of them, also are referred to in State ex rel. Burns v. Erickson, supra, 129 N.W.2d at 716, and in In re Trevithick, supra, 131 N.W.2d at 443. We ourselves recently observed, in connection with the issue of voluntariness of a federal plea,
 
 
 20
 "The question of involuntariness raised by petitioner always presents a troublesome issue in that the subjective mind of the petitioner is in question but resolution of that factual issue most often must be determined by objective evidence." Ford v. United States, 418 F.2d 855, 858 (8 Cir. 1969) (footnote omitted).
 
 
 21
 We note, in passing, that the South Dakota Supreme Court has not hesitated to grant habeas relief in appropriate cases. State ex rel. Henning v. Jameson, supra; State ex rel. Warner v. Jameson, supra. See State v. Haas, supra.
 
 
 22
 We turn to the facts of Miner's case. In his brief here he acknowledges his age (40 years old at the time of the acceptance of his plea and of the imposition of sentence by Judge Hersrud) and he flatly concedes that he was of sound mind. He states that he "has no complaint on the question of age or mental competency". We note that this eliminates immediately two of the five factors stressed by the South Dakota court in Thomlinson, supra, and leaves only inexperience in criminal procedures, lack of education, and gravity of the penalty.
 
 
 23
 By his own admission, however, Miner was frequently present, as a defendant, in the criminal courtroom. He had been there 30, and perhaps as often as 35 or 40, times. In 1942 he served 9 months and 18 days on a federal charge (rape). On that charge he had been represented by counsel. He possessed some education (to either the fourth or sixth grade; his testimony as to this varied) but he disclaimed the ability to read and write. The possible sentence under the molestation charge was, of course, substantial.
 
 
 24
 Recognizing that the "caution to be exercised on such occasions [accepting a guilty plea] bears a direct proportion to the gravity of the charge", State v. Sewell, 69 S.D. 494, 12 N.W.2d 198, 199 (1943), we must conclude, in accord with Judge Hersrud and Judge Nichol, that the record supports the finding that Miner's waiver of counsel was voluntary, that all federal constitutional requirements were fulfilled, and, moreover, that all standards of basic fairness were met. A reading of Judge Hersrud's examination of Miner at the time of arraignment is convincing. This reveals that the court (a) meticulously pointed out to Miner both the seriousness of the offense and the 20-year maximum sentence; (b) repeatedly advised him of the desirability of his being represented by an attorney; (c) told him that he was entitled so to be represented and that, if he had no funds, counsel would be assigned and the fees paid by the county; and (d) had the charge read to him and examined him as to his understanding of that charge.
 
 
 25
 Miner specifically acknowledged that he knew this was a serious offense; that the court had recommended that he have an attorney; that he understood what indecent molestation of children was; that he understood he could be imprisoned up to 20 years for this; that he knew he also had the right to defend himself; that he knew one is presumed to be innocent until proved guilty or until he admits his guilt; that he knew he possessed the rights of confrontation, of compelling witnesses to appear, and of a speedy, public and fair trial by jury; that he understood he was in court because he had been charged with a serious felony; that he did not want a trial; that he knew he was entitled to one; that he asked to be brought before the judge prior to the next regular term because "I want to get the sentence over with"; that no one talked him into this; that he appeared of his own free will; that he did not think there were any facts which a lawyer could present which would help him; that he understood the information which was read to him; and that he understood that any plea he would make must be voluntary.
 
 
 26
 The record discloses that Miner's answers were specific. The testimony, set forth in the state transcripts, of the justice of the peace and of the sheriff as to their explanations to Miner of his rights to counsel are corroborative.
 
 
 27
 It is difficult to conceive of a situation where the sentencing judge could have inquired in much more depth or with much more particularity. Yet he received positive and unequivocal answers from Miner. It is easy to say, in retrospect seven years after the event, that it may have been better if the state court had appointed counsel. But if relief is to be granted here, we would be required to ignore everything Miner said in response to the court's questions and to conclude that in cases such as this counsel must routinely be appointed and a trial forced. We then shall have reached the point where a plea of guilty cannot be accepted without counsel. That day may soon be upon us, but it is not for this court to say that it is here now when there are so many decisions on the books recognizing the waiver right.
 
 
 28
 In closing, we emphasize that we are not impressed with the suggestions made as to Miner's race, his inexperience with serious criminal charges, and the gentle treatment he received from the sheriff. We would not insult his justly proud race by assuming a lesser ability on his part to understand than is possessed by another person, not an American Indian, of like age and education. The other arguments strike us only as a new variable on an old situation and as unpersuasive. See State ex rel. Parker v. Jameson, supra, 61 N.W.2d at 833-834; Jarrett v. United States, supra; In re Stone, 171 N.W.2d 119 (N.D.1969).
 
 
 29
 The dissent professes profound concern about the jurisdiction of the South Dakota state court to accept Miner's plea of guilty in 1962 and to impose the sentence which he has been serving. The dissent raises this question of state (not federal) jurisdiction on its own. It is not raised by counsel here. It was not presented to Judge Nichol in the district court. And, so far as we can tell from the record, it has never been presented to the South Dakota courts. We refrain from indulging in advocacy and we defer our consideration of that issue until, if ever, it is properly before us. Our present decision, of course, is without prejudice to Miner's raising the state court jurisdiction issue by another appropriate application in the appropriate forum.
 
 
 30
 Affirmed.
 
 Appendix
 
 31
 The transcript of the arraignment of March 12, 1962, reads:
 
 
 32
 "BY THE COURT:
 
 
 33
 "Q Is that your true name — Nelson Miner?
 
 
 34
 "A Yes, sir.
 
 
 35
 "Q What is your age?
 
 
 36
 "A Forty.
 
 
 37
 "Q Do you have an attorney?
 
 
 38
 "A No, sir.
 
 
 39
 "Q Now, this is a serious criminal offense and is punishable by imprisonment in the South Dakota State penitentiary for not more than 20 years which makes it a very serious criminal offense and the Court believes that in such a case a man should be represented by an attorney. You know of course that you are entitled to be represented, if you so desire. You know that?
 
 
 40
 "A Yes.
 
 
 41
 "Q And that in any criminal action in circuit court where it is shown that the defendant is without means and unable to employ counsel the court shall assign counsel for his defense whose duty it shall be to appear for and defend the accused upon the charge against him and counsel so assigned shall be paid by the county. Now, you understand that you are entitled to be represented by an attorney?
 
 
 42
 "A Yes, sir.
 
 
 43
 "Q And, if you were without means and funds to hire one you would still be entitled to an attorney and that the court would appoint one for you. Do you understand that?
 
 
 44
 "A Yes.
 
 
 45
 "Q Do you want an attorney?
 
 
 46
 "A No, sir.
 
 
 47
 "Q What? I didn't hear your answer?
 
 
 48
 "A No, sir.
 
 
 49
 "Q You understand that it is a serious offense do you?
 
 
 50
 "A I do uh-huh.
 
 
 51
 "Q By that do you mean yes?
 
 
 52
 "A Yes, sir.
 
 
 53
 "Q How much education have you had?
 
 
 54
 "A Sixth grade is all.
 
 
 55
 "Q Sixth grade. Do you understand what I am discussing with you here in court?
 
 
 56
 "A Yes, sir.
 
 
 57
 "Q And you know this is a serious offense?
 
 
 58
 "A Yes, sir.
 
 
 59
 "Q And you wish — you want the court to understand that you do not want an attorney. Is that right?
 
 
 60
 "A That is right.
 
 
 61
 "Q You understand that the court has recommended to you that you do have an attorney. You do understand that?
 
 
 62
 "A Yes, sir.
 
 
 63
 "Q Very well. I understand that the states attorney has filed an information charging you with indescent molestation of children. Do you understand what that is?
 
 
 64
 "A Yes, sir, I do.
 
 
 65
 "Q And as I have told you you can be imprisoned up to 20 years in the penitentiary for that offense. Do you understand that?
 
 
 66
 "A Yes, I understand.
 
 
 67
 "Q And it is a felony. It is a serious offense. Now, in addition to this right to be represented by an attorney you also have a right to appear in court and defend yourself. Now, I want to ask you if you understand that you have that right?
 
 
 68
 "A Yes, sir.
 
 
 69
 "Q You also have the right to demand the nature of the charge or accusation against you and to have a copy of it. Do you understand that you have that right?
 
 
 70
 "A Yes, sir.
 
 
 71
 "Q You understand too that every person is presumed to be innocent of the charge against them unless they either admit their guilt or are proven to be guilty. Do you understand that?
 
 
 72
 "A Yes, sir.
 
 
 73
 "Q You also have the right to meet the witnesses against you face to face in open court to see and to hear them testify. Do you understand that you have that right?
 
 
 74
 "A Yes, sir.
 
 
 75
 "Q You also have the right to have compulsory [sic] process of the law served for obtaining witnesses in your own behalf. Do you understand that you have that right?
 
 
 76
 "A Yes.
 
 
 77
 "Q And the right to a speedy and a public trial by an impartial jury of the county in which the offense is alleged to have been committed in this case Dewey County, South Dakota. That means that you are brought to trial speedily at the next term of the court and that you have an impartial trial. That means a fair trial. Do you understand that you have a right to that?
 
 
 78
 "A Yes, sir.
 
 
 79
 "Q Now, is there anything about your being brought here or coming before the judge today that you don't understand?
 
 
 80
 "A No, sir.
 
 
 81
 "Q You understand you are here because they charge you have committed a serious felony?
 
 
 82
 "A Yes, sir.
 
 
 83
 "Q Now, do you want a trial? That means to determine whether or not you are guilty or not guilty or innocent?
 
 
 84
 "A No, sir.
 
 
 85
 "Q You do not want a trial?
 
 
 86
 "A No, sir.
 
 
 87
 "Q You know that you can have one and that [you] are entitled to it?
 
 
 88
 "A Yes, sir.
 
 
 89
 "Q Now, that is not regular time for the trial of cases in this county. That is in May. Now, did you ask to be brought here before the judge today?
 
 
 90
 "A Yes, sir.
 
 
 91
 "Q Was it your idea to come here?
 
 
 92
 "A I want to get the sentence over with.
 
 
 93
 "Q You want to get it over with?
 
 
 94
 "A Yes, sir.
 
 
 95
 "Q And is that why you are here today?
 
 
 96
 "A Yes, sir.
 
 
 97
 "Q Did you decide that yourself?
 
 
 98
 "A Yes.
 
 
 99
 "Q No one tried to talk you into that?
 
 
 100
 "A No, sir.
 
 
 101
 "Q And you understand that if you would enter a plea of guilty all this court would have left to do would be to sentence you. Do you understand that?
 
 
 102
 "A Yes.
 
 
 103
 "Q Now, are there any facts that you think a lawyer could present for you that would help your case in any way?
 
 
 104
 "A No, sir, I don't think so.
 
 
 105
 "Q You don't think so?
 
 
 106
 "A No.
 
 
 107
 "Q Are you appearing here today of your own free will?
 
 
 108
 "A Yes, it is my free will.
 
 
 109
 "Q Are you ready at this time to enter a plea to the information?
 
 
 110
 "A Yes, sir.
 
 
 111
 "Q Mr. Aberle:
 
 
 112
 MR. ABERLE: Here Mr. Nelson is a copy of the information which I have filed against you and which I will read at this time.
 
 
 113
 "(The information was read aloud and in full at this time)
 
 
 114
 "Q Nelson Miner, I will ask you if you understand what has been going on here in court?
 
 
 115
 "A Yes, sir, I understand.
 
 
 116
 "Q I will again ask you, if you would like to consult with an attorney about this matter?
 
 
 117
 "A No, sir.
 
 
 118
 "Q Now, Nelson Miner, you have heard the states attorney, Mr. Aberle, read the information charging you with the crime of indecent molestation of minor children under the age of 15 years and the names are Colleen Marie LaPlant of the age of six years and Rita Nadine LaPlant of the age of four years. Now, do you understand what you are charged with?
 
 
 119
 "A Yes, sir.
 
 
 120
 "Q Now, before I ask you what your plea will be I must impress upon you that any plea that you make must be voluntary and it must be of your own free will. Do you understand that?
 
 
 121
 "A Yes, sir.
 
 
 122
 "Q Are you ready to enter your plea?
 
 
 123
 "A Yes, sir.
 
 
 124
 "Q Very well then what is your plea to this information charging you with indecent molestation of — that is, committing lewd and lascivious acts, deeds, signs and performances and conduct upon the persons of Colleen Marie LaPlant of the age of six years and Rita Nadine LaPlant of the age of four years — in other words, that you did commit the crime of indecent molestation of children. Now, what is your plea — guilty or not guilty.
 
 
 125
 "A Guilty.
 
 
 126
 "Q Let the plea of guilty be entered. The defendant stands convicted in this court of the offense of indecent molestation of minor children. Now, I want to ask you if you know of any legal reason why sentence should not be pronounced upon you?
 
 
 127
 "A No, sir.
 
 
 128
 "Q Is that — is there any fact or facts about you that you think the court should know about?
 
 
 129
 "A I don't believe so.
 
 
 130
 "Q Every defendant upon conviction for a felony is entitled to 24 to 48 hours or longer on good cause shown between the time of conviction and sentence. Do you understand that you have that right between the time of conviction and sentence? Do you understand that?
 
 
 131
 "A Yes, sir.
 
 
 132
 "Q Do you wish to have the sentencing done at a later time or would you rather that the court would do it today?
 
 
 133
 "A I would rather have it done today.
 
 
 134
 "Q You understand that you would then have to waive this right to time between conviction and sentence, do you? Do you understand that?
 
 
 135
 "A Yes, sir.
 
 
 136
 "Q Now, is there any fact or facts surrounding either yourself or the commission of this offense that you wish to present to the court?
 
 
 137
 "A No, sir.
 
 
 138
 "Q Is that anything that you want to tell me?
 
 
 139
 "A No, sir.
 
 
 140
 * * * * * *
 
 
 141
 "Q To your knowledge is there anything wrong with your with you?
 
 
 142
 "A The only thing is when I am drinking.
 
 
 143
 "Q Do you think there is anything wrong with your mind?
 
 
 144
 "A No, just drink.
 
 
 145
 "Q In other words that you don't know what you are doing when you are drinking, is that what you mean?
 
 
 146
 "A Yes.
 
 
 147
 "Q Did you know these children?
 
 
 148
 "A Yes.
 
 
 149
 "Q Did they live close to where you were living?
 
 
 150
 "A I was staying with them at the time.
 
 
 151
 "Q With these LaPlant's?
 
 
 152
 "A Yes.
 
 
 153
 "Q Were their parents and you living in the same house?
 
 
 154
 "A Yes, sir.
 
 
 155
 "Q Have you ever been in trouble before?
 
 
 156
 "A Yes.
 
 
 157
 "Q What kind of trouble?
 
 
 158
 "A I was up here before you once before three or four years ago.
 
 
 159
 "Q What was that for?
 
 
 160
 "A Grand larceny.
 
 
 161
 "Q Did you serve any time in the penitentiary?
 
 
 162
 "A No, you gave me a two year suspended sentence."
 
 
 
 Notes:
 
 
 *
 Section 13.1727 read in part:
 "Any person who shall willfully and unlawfully commit any lewd or lascivious act upon or with the body, or or any part or member thereof, of a child under the age of fifteen years, with the intent of arousing, appealing to, or gratifying the lust or passion or sexual desires of such person, or of such child, shall be guilty of the crime of indecent molestation of a child.
 "Every person guilty of indecent molestation of a child is punishable by imprisonment in the South Dakota State Penitentiary for not more than twenty years, provided, however, that if death results to a minor child as a result of such indecent molestation the offense shall be deemed murder, and punishable as such."
 
 
 
 163
 LAY, Circuit Judge (dissenting).
 
 
 164
 I am unaware of another case where the law has shown such calloused insensitivity to the denial of basic constitutional rights of an individual. The proceedings in this case call to mind a critical observation by Mr. Justice Harlan made in another era: " `It is not the words of the law but the internal sense of it that makes the law: the letter of the law is the body; the sense and reason of the law is the soul.'" Civil Rights Cases, 109 U.S. 3, 26, 3 S.Ct. 18, 33, 27 L.Ed. 835 (1883) (dissenting opinion). If ever the "substance and spirit of the law" were rendered subordinate to legal formality, it occurred on March 28, 1962, when Nelson Miner was allowed to "waive" counsel and plead guilty to a state charge of "child molestation."
 
 
 165
 Nelson Miner is an Indian, who in 1962 was 40 years old. At this plateau of his life he had received the equivalent of only four to six years of primary education, commencing in 1929 and concluding in 1938.[1] He was illiterate. The record is clear that he had never learned to read or write.[2] As of March 1962 he had 41 prior arrests for intoxication. Twenty of these arrests had been since 1960. He had spent most of his life around other Indians speaking Indian language. In 1962 he could not speak the English language to any great extent. He understood only simple words. When employed, he had performed only menial labor, such as digging ditches, etc. Furthermore, as his counsel observed, at the time of conviction he had almost no exposure to "matters of civics, politics and social affairs." Counsel's reference to Miner's race, background and life on an Indian reservation is discounted by the majority, however, as being an insult to Miner's "justly proud race." In my judgment, the majority's allusion to such pride serves only to obscure proper consideration of the petitioner's obvious sub-cultural environment. Cf. Deloria, Custer Died For Your Sins (1969). M. J. Herskovits has cogently written: "Judgments are based on experience, and experience is interpreted by each individual in terms of his enculturation." Man and His Works 77-78 (1948).
 
 
 166
 On March 14, 1962, Miner was entrusted by his sister to "baby-sit" for his nieces, age 4 and age 6. He admittedly was drunk. He was arrested for intoxication the next day and upon pleading guilty was sentenced to five days. The nieces allegedly told their father after his return home that Miner had done something immoral. The children were examined by a doctor and no physical injury was found. The brother-in-law became angry, and based upon the children's story he had Miner arrested. The official charge was "indecent molestation of children" under S.D.C. § 13.1727. When the petitioner "waived" counsel and pled guilty he told the trial judge:
 
 
 167
 "Q To your knowledge is there anything wrong with your with you? [sic]
 
 
 168
 "A The only thing is when I am drinking.
 
 
 169
 "Q Do you think there is anything wrong with your mind?
 
 
 170
 "A No, just drink.
 
 
 171
 "Q In other words that you don't know what you are doing you are drinking, is that what you mean?
 
 
 172
 "Yes."
 
 
 173
 A justice of peace, Joe Paul, was the committing magistrate. Upon petitioner's arrest, Paul informed him of his rights. Paul's response, when asked by the state trial judge as to Miner's capacity to understand, is also somewhat illuminating:
 
 
 174
 "COURT: He says that he didn't understand these rights as they were explained to him. Now based upon your knowledge of the man for 15 or 16 years do you think he understood what was going on in that courtroom?
 
 
 175
 "A Well he understood part of it. He wouldn't understand it all but he is a man that don't understand too well of anything as far as that is concerned. But he understood part of the proposition." (My emphasis.)
 
 
 176
 At the time of Miner's alleged "waiver" of counsel and guilty plea, the record shows that Miner was not informed as to the specific nature of the offense other than in the conclusory language of the information. Miner was not told by the trial judge in factual terms what it was that he allegedly had done. Nor did the trial judge explain to him or explore whether there were possible defenses to the charge. Miner did state that he did not "think" he knew of any facts which a lawyer might present on his behalf. However, at the federal post-conviction hearing he significantly revealed the substance of an earlier conversation with the sheriff carried on at the time he was originally arrested:
 
 
 177
 "A And I told him I don't know; I says I was drunk at that time, and I don't know if I done it or not. So then he says, well, intoxication ain't going to help you out, he says. And well, I says, I don't care, I was drunk, and I don't know. Then he says, do you want me to take you to a lie detector, he says. Well, I don't know what that is, anyway, I says, and I says well, it don't make no difference because I was drunk, anyway. Then he got mad and locked me back in." (My emphasis.)
 
 
 178
 This suggests that Miner not only was left uninformed, but was even misinformed.
 
 
 179
 Much rhetoric recognizing the powerful commands inherent in the due process clause as to the right of an accused to effective legal counsel has found its way into judicial expression.[3] This constitutional right of counsel was born from necessity. Unknowing, untrained and indigent defendants had become easy prey for an over-zealous state, and the law, therefore, supplied the right to the prophylactic guardian. However, as soon as the law began to fully place the barrier of protection around an accused, the search for modes to circumvent the right became paramount. Dilution of the right was justified as being necessary to maintain the efficiency of the criminal process. It became simple ritualism for a prosecutor to overcome the impediment provided by the accused's right to counsel by securing an acknowledged and well recorded formal "waiver" of that right. This generally arose through the still sanctioned, but dubious process of plea bargaining. See Meyer v. United States, 424 F.2d 1181 (8 Cir. April 20, 1970) (Judge Lay, dissenting). Sometimes, however, as it has been here, a "waiver" was given because an accused possessed little or no capacity to appreciate the value and meaning of the right to counsel and was easily swayed "to get it (the trial and sentencing) over with." However, formalistic waiver of fundamental rights was supposedly not to be so easily condoned. The humane concept developed, that a legal waiver had to be "an intentional relinquishment or abandonment of a known right or privilege. (So that) [t]he determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." (My emphasis.) Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L. Ed. 309 (1948), Mr. Justice Black again made it clear that the background experience and conduct of the accused were to be weighed upon an assertion of a formal waiver to right of counsel. The fact that the record showed an accused was informed of his right to counsel and desired to waive such right was not by itself considered to be fulfillment of the constitutional obligation of the court. 332 U.S. at 724, 68 S.Ct. 316.
 
 
 180
 Before a waiver is to be accepted there is to be a "penetrating and comprehensive" discussion between court and the accused. A thorough examination is to be made into "all the circumstances." The accused must demonstrate a "broad understanding" not to some or part of the discussion but to the "whole matter." Mere explanation of the range of allowable punishments is only one facet of such examination. In addition, the specific nature of the charges should be spelled out, not just in conclusory terms but in factual language, so that the accused may fully understand what facts the state accuses him of unlawfully doing. Cf. e. g., United States v. Steele, 413 F.2d 967 (2 Cir. 1969). Any waiver of counsel must be "understandingly and wisely" made. In order for an accused to do so, a trial judge should determine if the accused fully appreciates any "possible defenses to charges" and whether there are any "mitigating circumstances" which a lawyer might present on his behalf. The accused should be informed and should demonstrate an understanding of what the law recognizes as mitigating factors and possible defenses under the circumstances.[4]
 
 
 181
 In Cash v. Culver, 358 U.S. 633, 79 S.Ct. 432, 3 L.Ed.2d 557 (1959), a pre-Gideon case, the United States Supreme Court observed:
 
 
 182
 "`Where the gravity of the crime and other factors — such as the age and education of the defendant, the conduct of the court or the prosecuting officials, and the complicated nature of the offense charged and the possible defenses thereto — render criminal proceedings without counsel so apt to result in injustice as to be fundamentally unfair,' the Constitution requires that the accused must have legal assistance at his trial. Uveges v. [Commonwealth of] Pennsylvania, 335 U.S. 437, 441, 69 S.Ct. 184, 93 L.Ed. 127. Of particular relevance here are the decisions of the Court which have held the appointment of counsel necessary to a fair trial because of the complexity of the proceedings. Rice v. Olson, 324 U.S. 786, 65 S.Ct. 989, 89 L.Ed. 1367; Gibbs v. Burke, 337 U.S. 773, 69 S.Ct. 1247, 93 L.Ed. 1686; and see Williams v. Kaiser, 323 U.S. 471, 475-476, 65 S.Ct. 363, 366, 89 L.Ed. 398." (My emphasis.) Id. at 637, 79 S.Ct. at 436.
 
 
 183
 In Moore v. Michigan, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167 (1957), on a charge of murder, where the defendant was a 17 year old, the Court said of the right to counsel:
 
 
 184
 "The record shows possible defenses which might reasonably have been asserted at trial, but the extent of their availability raised questions of considerable technical difficulty obviously beyond his capacity to comprehend." Id. at 160, 78 S.Ct. at 194.
 
 
 185
 Although this court has indicated that the question of waiver is usually one of fact (Johnson v. United States, 318 F.2d 855 (8 Cir. 1963)), the ultimate determination as to waiver of counsel is basically resolved by standards of due process, involving tests of fundamental fairness resting upon those principles enunciated by the United States Supreme Court. Johnson v. Zerbst, supra. See also Miranda v. Arizona, supra; Escobedo v. Illinois, supra; Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); Von Moltke v. Gillies, supra; Rice v. Olson, 324 U.S. 786, 65 S.Ct. 989, 89 L.Ed. 1367 (1945). See also Cox v. Burke, 361 F.2d 183 (7 Cir. 1966).
 
 
 186
 The American Bar Association's Standards Relating to Providing Defense Services, § 7.2, succinctly summarize these principles:
 
 
 187
 "The accused's failure to request counsel or his announced intention to plead guilty should not of itself be construed to constitute a waiver. An accused should not be deemed to have waived the assistance of counsel until the entire process of offering counsel has been completed and a thorough inquiry into the accused's comprehension of that offer and his capacity to make the choice intelligently and understandingly has been made. No waiver should be found to have been made where it appears that the accused is unable to make an intelligent and understanding choice because of his mental condition, age, education, experience, the nature or complexity of the case, or other factors."
 
 [5]
 
 188
 The instant record demonstrates that the state trial judge at the "waiver" proceedings three times recognized that Miner needed counsel. However, the state judge then misconstrued his obligation. The legal recognition that the Constitution "does not require under all circumstances counsel be forced upon a defendant"[6] does not serve as justification for an inadequate waiver. The court's responsibility must go beyond a mere recommendation of counsel when the record clearly demonstrates an accused's lack of capacity to understand the complexities of a charge and the existing defenses to it.
 
 
 189
 The majority opinion emphasizes the "in * * * depth * * * particularity" of the trial court's inquiry and the "positive and unequivocal" responses by Miner. I respectfully submit the record refutes this observation. The court's questions were framed for simple "yes" and "no" answers, with no attempt to reveal any subjective understanding of the accused.[7] See American Bar Association's Standards Relating to Providing Defense Services, commentary as to Waiver Process at 63.
 
 
 190
 It has been authoritatively written: "an understandable psychologic definition of an individual's freedom of will is his particular capacity for conscious, purposive, controlled action when confronted with a series of alternatives."[8] One cannot meaningfully choose between alternatives without complete comprehension of the true values the alternatives possess. Thus, a legal waiver should never be allowed where an accused's capacity to choose depends upon knowledge which he does not possess. Miner did not possess the personal capabilities to understand the nature of his situation and his incapacity is further emphasized by his lack of knowledge of relevant factors. It cannot be said in the present case that Miner fully understood the nature of this complex and serious crime, or the assistance which effective counsel could offer him. I have already noted that the trial court failed to fully inform him as to the nature and elements of the offense, or explore with him available defenses or any mitigating circumstances. It is revealing to note that several potentially signifcant factors which might have been raised on Miners' behalf were not known to him.
 
 
 191
 First, the record at the time of his alleged "waiver" does not show that Miner fully understood that the crime of "child molestation" under South Dakota laws[9] required "intent," that is, proof of a "wilful" act; and that at all times it was the burden of the state to prove this beyond a reasonable doubt. Compare Carnley v. Cochran, 369 U.S. 506, 82 S. Ct. 884, 8 L.Ed.2d 70 (1962), where the Supreme Court discusses the complexity of the offense of child molestation and that an illiterate would need counsel in such a case. See also Moore v. Michigan, supra.
 
 
 192
 Second, the record does not show that Miner was informed that in South Dakota a statutory defense of intoxication[10] may be asserted in any criminal case to rebut evidence of "intent"; or that evidence existed which would show a police officer found him so intoxicated the next day that he did not bother to explain anything to him because he said he was too drunk to understand.
 
 
 193
 Third, the record does not show Miner fully appreciated the facts that the state must prove the alleged crime by competent witnesses; that a crime cannot be proven by hearsay; that the capacity of a 4 year old and a 6 year old child to testify depends upon many intangible factors; and that a trial judge may bar testimony if a witness lacks either "sufficient mental capacity to observe, recollect and communicate" or a "sense of moral responsibility." Moser v. Moser, 82 S.D. 149, 143 N.W.2d 369 (1966).
 
 
 194
 Fourth, Miner was not informed that an attorney may seek allocution and attempt to show mitigating circumstances which could affect punishment as well as guilt.
 
 
 195
 Fifth, it is clear that Miner did not, and does not to this day fully appreciate that a state must establish jurisdiction in order to place a person on trial for any crime. It is doubtful that Miner even had the capacity to begin to appreciate what "jurisdiction" means. This is significant because there was a serious question in the minds of the state officials at the time of his arrest whether or not the state had jurisdiction to prosecute for the alleged crime. In fact, in my judgment the state "guessed" wrong concerning its jurisdiction.[11] However, PAGE CONTAINED FOOTNOTES without full brief, argument or comprehensive study, concededly, my appraisal of the jurisdictional question may be in error.[12] The jurisdictional problem is only raised here to emphasize that the judgment of the state conviction should be set aside for failure of the accused to fully comprehend the value of effective counsel.
 
 
 196
 Only if the accused was fully aware of these defenses and the fact that a competent attorney could assert them on his behalf, could he possibly have made an intelligent waiver of his right. The record is totally silent as to such knowledge. To rationalize that Miner had an appreciation of the complexities of the situation and the effective role competent counsel could serve, on this record, is inconceivable to me. It is manifest that petitioner here did not have a "broad understanding" of the surrounding circumstances of the state charge and the legal complexities of the defenses necessary for an intelligent waiver of counsel. Miner's experience over a lifetime with 41 charges of intoxication is a poor substitute for a working knowledge of the complexities of the process of the criminal law. Cf. e. g., Shawan v. Cox, 350 F.2d 909 (10 Cir. 1965); Nielsen v. Turner, 287 F.Supp. 116 (D.Utah 1968).
 
 
 197
 The most degrading, humiliating experience any human being, white or red, rich or poor, intelligent or not, can endure is a deprivation of one's personal liberty. To permit this under the circumstances existing here without any legal representation whatsoever is a mockery of the law itself. Before anyone forfeits his life or liberty, he should at least be given a meaningful opportunity to resort to the law which abhors forfeiture without proof of factual guilt and without positive indication of the existence of power of the committing authority. This to me is the essence of due process. I cannot in good conscience subscribe to the proposition that Nelson Miner has been afforded this protection.
 
 
 
 Notes:
 
 
 [1]
 He began with and repeated 1st grade; attended 2nd grade; was out of school a year; repeated 2nd grade; missed another year; attended 4th grade; attended 28 days of 5th grade; and then enrolled in 6th grade, although it is not clear how long he attended
 
 
 [2]
 It is somewhat ironic that both South Dakota and the federal statutes require a juror, presumably because it is essential to his ability to reach an intelligent and responsible verdict, be able to read, write and understand the English language. See S.D.C.L.Ann. § 16-13-10 (1967); 28 U.S.C.A. § 1861. Cf. United States v. Henderson, 298 F.2d 522 (7 Cir. 1962)
 
 
 [3]
 See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Perhaps the most cited, however, is the discourse by Mr. Justice Sutherland in Powell v. Alabama, 287 U.S. 45, 68-69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932):
 "What, then, does a hearing include? Historically and in practice, in our own country at least, it has always included the right to the aid of counsel when desired and provided by the party asserting the right. The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect."
 
 
 [4]
 In Burch v. United States, 359 F.2d 69 (8 Cir. 1966), this court cited with approval the language from Michener v. United States, 181 F.2d 911, 918 (8 Cir. 1950), where this court said: "And upon finding a competent, intelligent and intentional waiver of counsel, it is notthen any the more the duty of the trial judge to advise an accused respecting possible defenses." (My emphasis.) I cannot agree with this appraisal of the law of "waiver." The cart is placed before the horse.
 
 
 [5]
 Many cases have recognized that the court must consider the individual's capabilities in determining whether the information given him was sufficient for him to make an intelligent and knowing decision. See e. g., Meadows v. Maxwell, 371 F.2d 664 (6 Cir. 1967) (petitioner was charged with committing sexual offenses against his daughter; while record was sparse as to the warnings given him, the court said that with his limited education the warnings, if given, might have been misunderstood; court then reversed, concluding that the nature of the crime was not adequately explained to him and that he did not understand that he could receive a life sentence); Shawan v. Cox, 350 F.2d 909 (10 Cir. 1965) (an Indian, age 60 with less than an 8th grade education, was charged with assault with intent to kill; the court noted in finding no waiver that the trial judge had failed to adequately explain the nature of the charges, the possible sentencing and the effect of a guilty plea); United States ex rel. Slebodnik v. Pennsylvania, 343 F.2d 605 (3 Cir. 1965) (court determined that waiver of counsel by a 19 year old was not valid where his right to counsel, the complicated nature of the indictment, and the possible consequences of a guilty plea were not adequately explained to him); Snell v. United States, 174 F.2d 580 (10 Cir. 1949) (no questions asked by court to elicit information as to knowledge of right to assistance of counsel, range of punishment, defenses or possible circumstances of mitigation; court found no waiver without a "thorough inquiry * * * to insure the fullest protection of the constitutional right * * *."Id. at 581); Williams v. Huff, 79 U.S.App. D.C. 326, 146 F.2d 867 (1945) (the court in remanding a case back to the trial court for a determination, suggested that the the age (15) and education of petitioner would provide an inference that there was not an intelligent waiver); United States ex rel. Simon v. Maroney, 228 F.Supp. 800 (W.D.Pa.1964) (petitioner was 18 years of age, had a very low IQ, had been schooled in special classes for retarded children and was illiterate at sentencing; court concluded that in light of his background the accused could not knowingly and intelligently waive his right to counsel as to 6 felony charges, no matter whether or not he had been informed of his rights); Application of Estrada, 1 Ariz.App. 348, 403 P.2d 1 (1965) (a 14 year old, with an educational level of 4th grade was charged with kidnapping and aggravated assault and battery; the court concluded that the accused was incapable of making an intelligent waiver); Commonwealth ex rel. McCray v. Rundle, 415 Pa. 65, 202 A.2d 303 (1964) (defendant was charged with conspiracy, statutory rape, assault and battery, and contributing to the delinquency of a minor; court noted that record did not disclose extent of defendant's education, but concluded that a reading of the record demonstrated his skills were inadequate; court then concluded that given the superficial nature of the court's statements, the charge was too complex for an unrepresented layman to make an intelligent determination); People v. Amos, 21 A.D.2d 80, 249 N.Y.S.2d 740 (1964) (a 16 year old with a 3rd grade education was sentenced; later it was determined that he was also feebleminded; court held counsel was not understandingly, competently and intelligently waived); People v. Hardin, 207 Cal.App.2d 336, 24 Cal.Rptr. 563 (1962) (defendant was 18 years old; he answered questions with only yes and no answers, and showed some evidence of illiteracy; court noted the complexity of the crime charged (accessory), the failure of the trial court to determine capacity to understand, and the failure to convey an explanation of the essential nature of the crime; court then concluded waiver not possible given the accused's capabilities, the intricacies of the offense, and the apparent availability of a defense); Ex parte James, 38 Cal.2d 302, 240 P.2d 596 (1952) (an illiterate farm laborer without prior experience with the law or the intricacies of criminal procedure was charged with homicide; court in finding no waiver noted the complexity of the charge and the potentially available defense of self-defense and concluded that as the seriousness of the charge increases, a purported waiver was to be scrutinized with correspondingly increased care so that a waiver is not accepted unless the accused understands the nature of the charge, the elements of the offense, the pleas and defenses which may be available, and the punishment which may be exacted).
 
 
 [6]
 In Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942), Mr. Justice Frankfurter observed that "the Constitution does not force a lawyer upon a defendant." However, he added, "He may waive his constitutional right to assistance of counsel if he knows what he is doing and his choice is made with eyes open." See also Note, The Right of An Accused to Proceed Without Counsel, 49 Minn.L.Rev. 1133 (1965)
 
 
 [7]
 Competent trial lawyers know this manner of questioning is not a satisfactory method to use on the voir dire examination of potential jurors. When questions bring only a "yes" or "no" response, little information is communicated to the lawyer or to the court as to a prospective juror's subjective state of mind
 
 
 [8]
 Glueck, Laws & Psychiatry, Cold War or Entente Cordiale? 12 (1962)
 
 
 [9]
 S.D.C.L.Ann. § 22-22-7 (1967) provides:
 "Indecent molestation of child. — Any person who shall willfully and unlawfully commit any lewd or lascivious act upon or with the body, or any part or member thereof, of a child under the age of fifteen years, with the intent of arousing, appealing to, or gratifying the lust or passion or sexual desires of such person, or of such child, shall be guilty of the crime of indecent molestation of a child." (Formerly S.D. Code § 13.1727 (Supp.1960).
 
 
 [10]
 S.D.C.L.Ann. § 22-5-5 (1967) provides:
 "Voluntary intoxication — Crimes involving motive or intent. — No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the purpose, motive, or intent with which he committed the act."
 Cf. Goings v. United States, 377 F.2d 753 (8 Cir. 1967).
 
 
 [11]
 Miner allegedly committed this crime in the town of Eagle Butte, Dewey County, South Dakota. Miner himself is an enrolled member of the Cheyenne River Sioux Tribe. The children against whom Miner allegedly "acted" are both recognized as Indians
 Title 18 U.S.C.A. § 1152 provides:
 "Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.
 "This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."
 Title 18 U.S.C.A. § 1151 provides:
 "Except as otherwise provided in sections 1154 and 1156 of this title, the term `Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."
 Congress has given the States of Alaska, California, Minnesota, Nebraska, Oregon and Wisconsin jurisdiction over all crimes committed on Indian land within the particular state under 18 U.S.C.A. § 1162. South Dakota is not a designated state within the statute.
 In August 1953, pursuant to ch. 505 §§ 6, 7, 67 Stat. 588, 590, Congress offered to give other states the opportunity to assume jurisdiction over all Indian lands by passing necessary legislation. As of March 1962, South Dakota had not passed any laws to assume such jurisdiction. A subsequent attempt to do so was defeated by referendum of its people. See In re High Pine's Petition, 78 S.D. 121, 99 N.W.2d 38 (1959); Note, South Dakota Indian Jurisdiction, 11 S.D.L.Rev. 101 (1966).
 The rule is firmly established under United States v. Celestine, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909), that once the reservation is established all tracts remain within it until separated by Congress. Eagle Butte, the location of the alleged offense, was within the original boundaries of the Cheyenne River Reservation. Act of March 2, 1889, ch. 405, 25 Stat. 888. The only question remaining is whether Eagle Butte is contained in land which was "vacated and restored to the public domain." By Act of May 29, 1908, ch. 218, 35 Stat. 460, a part of the Cheyenne River Reservation, including the lands on which the township of Eagle Butte is located, was opened for sale to the general public. The 1908 statute which opened the land to settlement indicates that the Cheyenne River Reservation was thus "diminished." This language was interpreted in United States v. La Plant, 200 F. 92 (D.C.1911), as extinguishing all Indian title to the land. The South Dakota Supreme Court has relied upon La Plant in a similar holding. Lafferty v. State, 80 S.D. 411, 125 N.W.2d 171 (1963).
 The difficulty with reliance upon the La Plant case is the expressed overruling of the case by this court some 46 years later. See Putnam v. United States, 248 F.2d 292 (8 Cir. 1957). This was done in light of United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914). Pelican involved the Act of July 1, 1892, ch. 140, 27 Stat. 62, wherein a specified tract within the reservation was "vacated and restored to the public domain." It specifically dealt with Indian allotments in areas otherwise vavacated.
 If there was any question concerning the viability of La Plant, however, it should have been put to rest by Seymour v. Superintendent, etc., 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). Although under the Act of 1908, a part of the Cheyenne River Reservation lands was opened to public sales, nevertheless the Act provided that the United States was to act as trustee for said Indians to dispose of said lands and to maintain the proceeds on their behalf. Cf. 368 U.S. at 355, 82 S.Ct. 424. See also Memorandum of Solicitor to Commissioner of Indian Affairs, March 13, 1970 (M-36802), relating to the boundaries of the Fort Berthold Reservation in North Dakota as affected by the Act of June 1, 1910, 36 Stat. 455. Such a provision is strong indication that the lands were not restored to the public domain. Obviously, the reservation was "diminished" by sale of lands to non-Indians but there is nothing in the 1908 Act itself that indicates that those portions of the reservation sold or set aside as a township were to be "vacated and restored to the public domain." Strong argument can be made under the language of Seymour v. Superintendent, etc., supra, that the Act "did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." 368 U.S. at 356, 82 S.Ct. at 427.
 
 
 [12]
 At the very least, if Miner's conviction is not set aside in the present action, he should immediately apply for counsel to urge the jurisdictional question in state court