SEYMOUR *v.* SUPERINTENDENT
OF WASHINGTON STATE PENITENTIARY.

No. 62.   Argued December 13, 1961.—Decided January 15, 1962.

*Glen A. Wilkinson* argued the cause and filed briefs for petitioner.   *Claron C. Spencer* was with him on the briefs.

*Stephen C. Way*, Assistant Attorney General of Washington, argued the cause for respondent. With him on the brief was *John J. O'Connell*, Attorney General.

At the request of the Court, *Solicitor General Rankin* filed a memorandum for the United States.

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner Paul Seymour was charged with burglary by the State of Washington in the Superior Court of Okanogan County and pleaded guilty to the lesser included offense of attempted burglary. Upon this plea he was convicted and sentenced to serve seven and one-half years in the state penitentiary. Later, he commenced this proceeding by filing a petition for writ of habeas corpus in the State Supreme Court urging that his state conviction was void for want of jurisdiction on the grounds that he was an enrolled, unemancipated member of the Colville Indian Tribe and therefore a ward of the United States; that the "purported crime" of burglary for which he had been convicted was committed in "Indian country" as defined in 18 U. S. C. § 1151; [1] and that burglary committed by an Indian in Indian country is an offense "within the exclusive jurisdiction of the United States" under 18 U. S. C. § 1153.[2] Since the petition, return and answer raised issues of fact, the State Supreme Court referred the matter to the original trial court to determine (1) whether petitioner was a member of the Colville Tribe, and (2) whether the offense was

---

[1] 62 Stat. 757, as amended, 63 Stat. 94.

[2] "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, rape, incest, assault with intent to kill, assault with a dangerous weapon, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." 62 Stat. 758.

committed in Indian country. After hearings, the trial court upheld petitioner's claim of membership in the Colville Tribe, but rejected his contention that the burglary upon which the state conviction was based had occurred in Indian country.

The trial court's conclusion that the crime did not take place in Indian country was not based upon any factual doubt as to the precise place where the burglary occurred for that fact was undisputed. Nor did that conclusion rest upon any uncertainty as to the proper definition of the term "Indian country" for the court expressly recognized the applicability of § 1151 which defines the term to include "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation . . . ." Rather, the trial court's conclusion rested solely upon its holding that, although the land upon which the burglary occurred had once been within the limits of an Indian reservation, that reservation had since been dissolved and the land in question restored to the public domain.

Agreeing with the trial court, the State Supreme Court then denied the petition for habeas corpus,[3] holding as it previously had in *State ex rel. Best* v. *Superior Court*,[4] that "What is still known as the south half of the diminished Colville Indian reservation is no longer an Indian reservation." Since the question of whether the place where the crime occurred is a part of an Indian reservation and therefore Indian country within the meaning of §§ 1151 and 1153 depends upon the interpretation and application of federal law, and since the resolution of that question as presented in this case raises issues of importance pertain-

---

[3] 55 Wash. 2d 109, 346 P. 2d 669.
[4] 107 Wash. 238, 241, 181 P. 688, 689.

ing to this country's relationship to its Indian wards, we granted certiorari.[5]

The case turns upon the current status of the Colville Indian Reservation—a reservation created in 1872 by Executive Order of President Grant which declared that "the country bounded on the east and south by the Columbia River, on the west by the Okanagan River, and on the north by the British possessions, be, and the same is hereby, set apart as a reservation for" the Colville Indians.[6] In 1892, the size of this reservation was diminished when Congress passed an Act providing that, subject to reservations and allotments made to individual Colville Indians, about one-half of the original Colville reservation, since commonly referred to as the "North Half," should be "vacated and restored to the public domain . . . ."[7] This Act did not, however, purport to affect the status of the remaining part of the reservation, since known as the "South Half" or the "diminished Colville Indian Reservation," but instead expressly reaffirmed that this South Half was "still reserved by the Government for their [the Colville Indians'] use and occupancy."[8] Since the burglary of which petitioner was convicted occurred on land within the South Half, it is clear that state jurisdiction over the offense charged, if it is to be found at all, must be based upon some federal action subsequent to the 1892 Act.

The Washington courts found authority for the assertion of state jurisdiction in a 1906 Act of Congress[9] implemented by a 1916 Presidential Proclamation.[10] The 1906 Act provided for the sale of mineral lands and

---

[5] 365 U. S. 833.

[6] I Kappler, Indian Affairs, Laws and Treaties (2d ed.), p. 916.

[7] 27 Stat. 62, 63.

[8] 27 Stat., at 64.

[9] 34 Stat. 80.

[10] 39 Stat. 1778.

for the settlement and entry under the homestead laws of other surplus lands remaining on the diminished Colville Reservation after allotments were first made and patents issued for 80 acres of land to "each man, woman, and child" either "belonging to or having tribal relations on said Colville Indian Reservation . . . ." The 1916 Presidential Proclamation issued pursuant to this Act simply prescribed the method for disposal of surplus lands under the homestead laws as the 1906 Act had authorized. The Washington courts viewed this 1906 Act and the 1916 Presidential Proclamation as completely wiping out the South Half of the Colville Reservation in precisely the same manner as the 1892 Act had "vacated and restored" the North Half of the reservation "to the public domain." Upon careful consideration, however, we cannot agree with that conclusion for it has no support in the language of the 1906 Act and ignores important differences between that Act and the provisions of the 1892 Act restoring the North Half of the reservation to the public domain.

Nowhere in the 1906 Act is there to be found any language similar to that in the 1892 Act expressly vacating the South Half of the reservation and restoring that land to the public domain. Quite the contrary, the 1906 Act repeatedly refers to the Colville Reservation in a manner that makes it clear that the intention of Congress was that the reservation should continue to exist as such.[11] Moreover, the 1906 Act, unlike the 1892 Act, provides that the proceeds from the disposition of lands affected by its provisions shall be "deposited in the Treasury of the United States to the credit of the Colville and confederated tribes of Indians belonging and having tribal rights on the Colville Indian Reservation, in the State of Washington . . . ." The 1892 Act had provided for congressional power to appropriate the net proceeds

---

[11] See §§ 2, 3, 6 and 12, 34 Stat., at 80–82.

from the sale and disposition of lands in the North Half of the original reservation for the general public use. Consequently, it seems clear that the purpose of the 1906 Act was neither to destroy the existence of the diminished Colville Indian Reservation nor to lessen federal responsibility for and jurisdiction over the Indians having tribal rights on that reservation. The Act did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards.

That this is the proper construction of the 1906 Act finds support in subsequent congressional treatment of the reservation. Time and time again in statutes enacted since 1906, Congress has explicitly recognized the continued existence as a federal Indian reservation of this South Half or diminished Colville Indian Reservation.[12] As recently as 1956, Congress enacted a statute which provides that "the undisposed-of lands of the Colville Indian Reservation, Washington, dealt with by the Act of March 22, 1906 (34 Stat. 80), are hereby restored to tribal ownership to be held in trust by the United States to the same extent as all other tribal lands *on the existing reservation,* subject to any existing valid rights." [13]

---

[12] See, *e. g.,* 39 Stat. 123, 154–155; 39 Stat. 672; 40 Stat. 449; 41 Stat. 535; 43 Stat. 21; 54 Stat. 703; 69 Stat. 141, 143; 70 Stat. 626–627. Two of these statutes, 40 Stat. 449 passed in 1918 and 41 Stat. 535 passed in 1920, do illustrate that there may have been some congressional confusion on this issue during that short period of time for they referred to the "former Colville Indian Reservation, Washington."

[13] 70 Stat. 626–627. It is also significant that § 5 of this 1956 Act, while recognizing the continued existence of the Colville Reservation, contained a provision looking towards "the termination of Federal supervision over the property and affairs of the Confederated Tribes and their members . . ." within a reasonable time. This Act followed closely a 1953 Act, 67 Stat. 588, 590, § 7 of which provided a way in which the State of Washington could acquire jurisdiction over the

(Emphasis supplied.) This same construction of the 1906 Act has been adopted by the Department of Interior, the agency of government having primary responsibility for Indian affairs.[14] And the Solicitor General has urged this construction upon the Court in this very case. We therefore conclude that the Washington courts erred in holding that the 1906 Act dissolved the Colville Indian Reservation because it seems clear that this reservation is still in existence.

Counsel for the State of Washington present two alternative contentions which, if sound, would sustain the jurisdiction of the State over the land here in question even if the Act of 1906 did not completely dissolve the reservation in the manner held by the Washington courts. The first of these rests upon the assertion that the particular parcel of land upon which this burglary was committed is held under a patent in fee by a non-Indian. The contention is that, even though the reservation was not dissolved completely by the Act permitting non-Indian settlers to come upon it, its limits would be diminished by the actual purchase of land within it by non-Indians because land owned in fee by non-Indians cannot be said to be reserved for Indians. This contention is not entirely implausible on its face and, indeed, at one time had the support of distinguished commentators on Indian Law.[15] But the issue has since been squarely put to rest by congressional enactment of the currently prevailing definition of Indian country in § 1151 to include "all land within the limits of any Indian reservation under the jurisdiction

reservation by meeting certain conditions prescribed there by Congress. See *Williams* v. *Lee,* 358 U. S. 217, 222, note 10. These conditions have not as yet been met with respect to the Colville Reservation.

[14] See, *e. g.,* 54 I. D. 559; 59 I. D. 147; 60 I. D. 318.

[15] See, *e. g.,* Cohen, Handbook of Federal Indian Law, 359 (1942). Of course this work was compiled before the 1948 amendment which enacted the present definition of Indian country as set out in 18 U. S. C. § 1151.

of the United States Government, notwithstanding the issuance of any patent . . . ."

The State urges that we interpret the words "notwithstanding the issuance of any patent" to mean only notwithstanding the issuance of any patent to an Indian. But the State does not suggest, nor can we find, any adequate justification for such an interpretation. Quite the contrary, it seems to us that the strongest argument against the exclusion of patented lands from an Indian reservation applies with equal force to patents issued to non-Indians and Indians alike. For that argument rests upon the fact that where the existence or nonexistence of an Indian reservation, and therefore the existence or nonexistence of federal jurisdiction, depends upon the ownership of particular parcels of land, law enforcement officers operating in the area will find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense, even though committed within the reservation, is in the State or Federal Government.[16] Such an impractical pattern of checkerboard jurisdiction was avoided by the plain language of § 1151 and we see no justification for adopting an unwarranted construction of that language where the result would be merely to recreate confusion Congress specifically sought to avoid.

The second alternative contention pressed by the State of Washington rests upon the fact that the land on which the burglary occurred is located within the governmental townsite of Omak, a town laid out by the Federal Government pursuant to authority granted in § 11 of the 1906 Act. The State contends that when this authorized townsite plot was filed for record in Okanogan County,

---

[16] Objection to the possibility of such an administratively unworkable distribution of criminal jurisdiction has been voiced by the Solicitor of the Department of Interior. 61 I. D. 298, 304. And see *United States* v. *Frank Black Spotted Horse*, 282 F. 349, 353–354.

all the lands encompassed within the townsite were thereby dedicated to the public interest and, since this dedication to the public is inconsistent with any reservation for the Indians, all these lands became subject to the exercise of criminal jurisdiction by the courts of Washington. This contention is nothing more than a variation of the State's first alternative contention for it simply attempts to make a special case for excluding from a reservation lands owned by towns as opposed to lands owned by individual non-Indians. The arguments which led us to reject the State's first alternative contention, though present only with somewhat less force here, are nonetheless entirely adequate to require the same answer to this contention. Moreover, the State can point to no language in § 1151's definition of Indian country which lends the slightest support to the idea that by creating a townsite within an Indian reservation the Federal Government lessens the scope of its responsibility for the Indians living on that reservation.

In *United States* v. *Celestine*,[17] this Court said that "when Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress." We are unable to find where Congress has taken away from the Colville Indians any part of the land within the boundaries of the area which has been recognized as their reservation since 1892. Since the burglary with which petitioner was charged occurred on property plainly located within the limits of that reservation, the courts of Washington had no jurisdiction to try him for that offense.

The judgment of the Washington Supreme Court denying petitioner's plea for a writ of habeas corpus is therefore reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

---

[17] 215 U. S. 278, 285.