**UNITED STATES of America ex rel. Tilden Louis CONDON, Plaintiff,**

v.

**Don R. ERICKSON, Warden of the South Dakota State Penitentiary, Defendant.**

**Civ. No. 71–17S.**

United States District Court, D. South Dakota, S. D.

June 27, 1972.

John E. Simko, of Woods, Fuller, Shultz & Smith, Sioux Falls, S. D., for plaintiff.

Walter W. Andre, Sp. Asst. Atty. Gen., Pierre, S. D., and Roger A. Schiager, Sp. Asst. Atty. Gen., Sioux Falls, S. D., for defendant.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

On May 8, 1972, this Court held an evidentiary hearing to determine jurisdiction, pursuant to an order of the Eighth Circuit Court of Appeals in United States ex rel. Condon v. Erickson, 459 F.2d 663 (8th Cir. 1972). The sole question to be determined was whether the Act of Congress of May 29, 1908, 35 Stat. 460, providing for the sale of unalloted lands in the Cheyenne River Reservation, diminished the boundaries of the Cheyenne River Reservation.

Condon contends that his state conviction for the crime of rape committed in the public library at Eagle Butte, South Dakota, was void for want of jurisdiction. He is an enrolled, unemancipated member of the Cheyenne River Sioux Indian Tribe, and therefore a ward of the United States. Condon alleges that the

crime to which he pleaded guilty was committed in "Indian country" as defined in 18 U.S.C.A. Sec. 1151 and that rape committed by an Indian within Indian country is an offense "within the exclusive jurisdiction of the United States" under 18 U.S.C.A. Sec. 1153. The place where the crime occurred is in that portion of the Cheyenne River Reservation which was opened to White settlement under the May 29, 1908 Act of Congress, 35 Stat. 460.

The Cheyenne River Indian Reservation was created by Act of Congress on April 30, 1888, 25 Stat. 94, and the Act of March 2, 1889, 25 Stat. 888, by being set apart from the Great Reservation of the Sioux Nation as a "permanent reservation for the Indians." All those portions of the Great Sioux Reservation outside the reservations established (with minor exceptions not relevant here) by the Act were expressly restored to the public domain. 25 Stat. 94, Sec. 21, and 25 Stat. 888, Sec. 21. The town of Eagle Butte, South Dakota, was within the original confines of the Cheyenne River Reservation. Thus if state jurisdiction is to be found, it must be based on some congressional action subsequent to the 1888 and 1889 Acts.

The South Dakota courts found authority for the assertion of state jurisdiction in the Act of May 29, 1908, 35 Stat. 460, which provided for sale of that portion of the Cheyenne River Reservation specifically described in the Act, except those portions alloted to Indians, under the homestead and townsite laws of the United States. State v. Barnes, 81 S.D. 511, 137 N.W.2d 683 (1965); Lafferty v. State, 80 S.D. 411, 125 N.W.2d 171 (1963).

The controlling case is Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). The Supreme Court there relied on two bases for its decision: (1) Whether or not the act expressly or by implication restores the land to the public domain; and (2) Whether subsequent congressional treatment of the reservation indicates it was restored to the public domain.

There is no express provision in the 1908 Act similar to that of the 1888 and 1889 Acts expressly restoring portions of the reservation to the public domain. However, Section 2 of the 1908 Act provided that prior to the proclamation of the President opening the described land to settlement the Secretary of the Interior could

permit Indians who have an allotment within the area described in section one of this Act to relinquish such allotment and to receive in lieu thereof an allotment anywhere within the respective reservations *thus diminished.* . . . (emphasis added)

Section 9 of the 1908 Act, after providing that the Indians are to retain all existing treaty rights consistent with the Act, provided that Indians residing on their allotments in certain townships should have the use of the timber in said townships for domestic purposes "only as long as the lands *remain part of the public domain.*" (emphasis added). These townships the act had just opened to white settlement. All of the language in the 1908 Act referring to the continued existence of the Cheyenne River Reservation is consistent with the theory that the Act was diminishing the reservation. This is the main distinction between the *Seymour* case and this case. In *Seymour* the state claimed the Act of March 22, 1906, 34 Stat. 80, extinguished the entire reservation. Thus it would have been useless for the Act to refer to the Coleville Reservation as it did. That is not true here since the 1908 Act could be merely diminishing the size of the reservation and not extinguishing it. Thus there would be meaning to Sections 2, 3, and 6 of the 1908 Act when referring to the Cheyenne River Reservation and the holding of the money from the sale of the land in trust for the Indians of the Cheyenne River Reservation. There is nothing inconsistent with Sections 2 and 3 of the Act referring to the reservations as they ex-

isted at the time of the Act in describing the land to be surveyed with the theory that Congress was diminishing the boundaries of the reservation.

That this should be the proper construction of the 1908 Act finds support in subsequent congressional treatment of the reservation. By Act of June 18, 1934, 48 Stat. 984, the Secretary of the Interior was authorized to restore to tribal ownership the remaining surplus lands of the Cheyenne River Reservation heretofore opened and add such lands to existing reservations. By Act of July 11, 1940, 54 Stat. 1336, the Secretary of the Interior was authorized to reinstate any entry or purchase on the opened lands "within the *ceded areas* of the Cheyenne River Reservation" (emphasis added) that had been cancelled. On February 1, 1952, the Secretary of the Interior, pursuant to the above authority, issued an Order of Restoration No. 52–1317, 17 Fed.Reg. 24 (1952), restoring to the Cheyenne River Reservation all of the undisposed of land opened to white settlement in the 1908 Act, describing it as "being within the boundaries of the *former Cheyenne River Reservation*" (emphasis added) and ordering that said land be "added to and made a part of the existing Reservation."

However, this Court must also consider the recent Eighth Circuit opinion in City of New Town, North Dakota v. United States, 454 F.2d 121, 125 (8th Cir. 1972). Judge Gibson there enunciated three principles to be followed in determining whether an Act of Congress diminishes an Indian reservation.

(1) When Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress. United States v. Celestine, 215 U.S. 278, 285, 30 S.Ct. 93, 54 L Ed. 195 (1909) . . . . (2) The purpose to abrogate treaty rights of Indians is not to be lightly imputed to Congress. Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). (3) The opening of an Indian reservation for settlement by homesteading is not inconsistent with its continued existence as a reservation. Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962).

Congress established the boundaries of the Cheyenne River Reservation in the 1888 and 1889 Acts and has not diminished them by express language since. The most that could be said for the 1908 Act is that it reduced the boundaries by implication.

■ The 1888 and 1889 Acts, at Sec. 4, established the Cheyenne River Reservation as a "permanent reservation." The 1908 Act, in Sec. 9, provided that nothing in the Act deprived the Indians of the Cheyenne River Reservation "of any benefits to which they are entitled under existing treaties or agreements not inconsistent with the provisions of this Act." Thus the wording of Judge Gibson in City of New Town, North Dakota v. United States, 454 F.2d 121, 125 (8th Cir. 1972), is applicable here. Judge Gibson wrote:

The right to have the reservation boundaries remain undiminished carries with it many important subsidiary rights, among them the right for unemancipated Indians to be subject only to federal and tribal jurisdiction. The 1910 Act specifically recognized that the opening of the reservation for homesteading was not intended to deprive the Indians of any rights not inconsistent with the Act, and as *Seymour* establishes, homesteading is not inconsistent with the maintenance of the original reservation boundaries. The 1910 Act clearly by its own terms does not purport to alter the reservation boundaries.

■ Thus under the reasoning of the Eighth Circuit the 1908 Act did not diminish the boundaries of the Cheyenne River Reservation as established in the 1888 and 1889 Acts. Since Eagle Butte is within the original boundaries of the Cheyenne River Reservation, the state of

South Dakota had no jurisdiction to convict Condon for a crime committed on the reservation. Jurisdiction lies in the United States Courts under 28 U.S.C.A. Secs. 1151 and 1153.

This view is supported by Congress' definition of "Indian country" in 28 U.S.C.A. Sec. 1151: "the term 'Indian country' . . . means (a) all land within the limits of any Indian reservation . . . notwithstanding the issuance of any patent . . . ." Thus Congress was specifically providing federal jurisdiction in instances such as the 1908 Act where part of a reservation was opened to white settlement.

Therefore, Condon's petition for writ of habeas corpus originally filed with this Court on March 29, 1971, and denied by this Court for failure to exhaust state court remedies on August 12, 1971, is granted.

This memorandum decision shall constitute the Court's findings of fact and conclusions of law pursuant to 28 U.S.C.A. Sec. 2243.