## UNITED STATES *v.* ANTELOPE ET AL.

No. 75–661.   Argued January 18, 1977—Decided April 19, 1977

BURGER, C. J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Thornburgh, Harry R. Sachse,* and *Jerome M. Feit.*

*Allen V. Bowles,* by appointment of the Court, 429 U. S. 892, argued the cause and filed a brief for respondent Antelope. *John W. Walker,* by appointment of the Court, *ibid.,* argued the cause and filed a brief for respondents Davison et al.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented by our grant of certiorari is whether, under the circumstances of this case, federal criminal statutes violate the Due Process Clause of the Fifth Amendment by subjecting individuals to federal prosecution by virtue of their status as Indians.

(1)

On the night of February 18, 1974, respondents, enrolled Coeur d'Alene Indians, broke into the home of Emma Johnson, an 81-year-old non-Indian, in Worley, Idaho; they robbed and killed Mrs. Johnson. Because the crimes were committed by enrolled Indians within the boundaries of the Coeur d'Alene Indian Reservation, respondents were subject to federal jurisdiction under the Major Crimes Act, 18 U. S. C. § 1153.[1] They were, accordingly, indicted by a federal grand jury on

---

[1] Title 18 U. S. C. § 1153 at the time in question provided in pertinent part:

"Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to kill, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties

charges of burglary, robbery, and murder.[2]   Respondent William Davison was convicted of second-degree murder only. Respondents Gabriel Francis Antelope and Leonard Davison were found guilty of all three crimes as charged, including first-degree murder under the felony-murder provisions of 18 U. S. C. § 1111,[3] as made applicable to enrolled Indians by 18 U. S. C. § 1153.

(2)

In the United States Court of Appeals for the Ninth Circuit, respondents contended that their felony-murder convictions

---

as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

The background leading up to enactment of the Major Crimes Act is discussed in *Keeble* v. *United States*, 412 U. S. 205, 209–212 (1973). As noted in that case, the Government has characterized the Major Crimes Act as "a carefully limited intrusion of federal power into the otherwise exclusive jurisdiction of the Indian tribes to punish Indians for crimes committed on Indian land." *Id.*, at 209.

[2] Except for the offenses enumerated in the Major Crimes Act, all crimes committed by enrolled Indians against other Indians within Indian country are subject to the jurisdiction of tribal courts. 18 U. S. C. § 1152. Not all crimes committed within Indian country are subject to federal or tribal jurisdiction, however. Under *United ·States* v. *McBratney,* 104 U. S. 621 (1882), a non-Indian charged with committing crimes against other non-Indians in Indian country is subject to prosecution under state law.

[3] Title 18 U. S. C. § 1111 is the federal murder statute. It provides in pertinent part:

"(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

"Any other murder is murder in the second degree."

It should be emphasized that respondent William Davison was convicted only of second-degree murder, not felony murder, under 18 U. S. C. § 1111.

were unlawful as products of invidious racial discrimination. They argued that a non-Indian charged with precisely the same offense, namely the murder of another non-Indian within Indian country,[4] would have been subject to prosecution only under Idaho law, which in contrast to the federal murder statute, 18 U. S. C. § 1111, does not contain a felony-murder provision.[5] To establish the crime of first-degree murder in state court, therefore, Idaho would have had to prove premeditation and deliberation. No such elements were required under the felony-murder component of 18 U. S. C. § 1111.

Because of the difference between Idaho and federal law, the Court of Appeals concluded that respondents were "put at a serious racially-based disadvantage," 523 F. 2d 400, 406 (1975), since the Federal Government was not required to establish premeditation and deliberation in respondents' federal prosecution. This disparity, so the Court of Appeals concluded, violated equal protection requirements implicit in the Due Process Clause of the Fifth Amendment. We granted the United States' petition for certiorari, 424 U. S. 907 (1976), and we reverse.

---

[4] See n. 2, *supra*. Federal law ostensibly extends federal jurisdiction to all crimes occurring in Indian country, except offenses subject to tribal jurisdiction. 18 U. S. C. § 1152. However, under *United States* v. *McBratney, supra,* and cases that followed, this Court construed § 1152 and its predecessors as not applying to crimes by non-Indians against other non-Indians. Thus, respondents correctly argued that, had the perpetrators of the crimes been non-Indians, the courts of Idaho would have had jurisdiction over these charges.

[5] Idaho statutes contain the following definition of first-degree murder: "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate and premeditated killing is murder of the first degree. Any murder of any peace officer of this state or of any municipal corporation or political subdivision thereof, when the officer is acting in line of duty, . . . shall be murder in the first degree. . . . All other kinds of murder are of the second degree." Idaho Code § 18–4003 (Supp. 1976).

## (3)

The decisions of this Court leave no doubt that federal legislation with respect to Indian tribes, although relating to Indians as such, is not based upon impermissible racial classifications. Quite the contrary, classifications expressly singling out Indian tribes as subjects of legislation are expressly provided for in the Constitution [6] and supported by the ensuing history of the Federal Government's relations with Indians.

> "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory, *Worcester* v. *Georgia*, 6 Pet. 515, 557 (1832); they are 'a separate people' possessing 'the power of regulating their internal and social relations . . . .' " *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975).

Legislation with respect to these "unique aggregations" has repeatedly been sustained by this Court against claims of unlawful racial discrimination. In upholding a limited employment preference for Indians in the Bureau of Indian Affairs, we said in *Morton* v. *Mancari*, 417 U. S. 535, 552 (1974):

> "Literally every piece of legislation dealing with Indian tribes and reservations . . . single[s] out for special treatment a constituency of tribal Indians living on or near reservations. If these laws . . . were deemed invidious racial discrimination, an entire Title of the United States Code (25 U. S. C.) would be effectively erased . . . ."

In light of that result, the Court unanimously concluded in *Mancari:*

> "The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities . . . ." *Id.,* at 554.

---

[6] Article I, § 8, of the Constitution gives Congress power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes."

Last Term, in *Fisher* v. *District Court,* 424 U. S. 382 (1976), we held that members of the Northern Cheyenne Tribe could be denied access to Montana State courts in connection with an adoption proceeding arising on their reservation. Unlike *Mancari,* the Indian plaintiffs in *Fisher* were being denied a benefit or privilege available to non-Indians; nevertheless, a unanimous Court dismissed the claim of racial discrimination:

> "[W]e reject the argument that denying [the Indian plaintiffs] access to the Montana courts constitutes impermissible racial discrimination. The exclusive jurisdiction of the Tribal Court does not derive from the race of the plaintiff but rather from the quasi-sovereign status of the Northern Cheyenne Tribe under federal law." 424 U. S., at 390.

Both *Mancari* and *Fisher* involved preferences or disabilities directly promoting Indian interests in self-government, whereas in the present case we are dealing, not with matters of tribal self-regulation, but with federal regulation of criminal conduct within Indian country implicating Indian interests. But the principles reaffirmed in *Mancari* and *Fisher* point more broadly to the conclusion that federal regulation of Indian affairs is not based upon impermissible classifications. Rather, such regulation is rooted in the unique status of Indians as "a separate people" with their own political institutions. Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a " 'racial' group consisting of 'Indians' . . . ." *Morton* v. *Mancari, supra,* at 553 n. 24. Indeed, respondents were not subjected to federal criminal jurisdiction because they are of the Indian race but because they are enrolled members of the Coeur d'Alene Tribe.[7] We

---

[7] As was true in *Mancari,* federal jurisdiction under the Major Crimes Act does not apply to "many individuals who are racially to be classified as 'Indians.'" 417 U. S., at 553 n. 24. Thus, the prosecution in this case offered proof that respondents are enrolled members of the Coeur

therefore conclude that the federal criminal statutes enforced here are based neither in whole nor in part upon impermissible racial classifications.

(4)

The challenged statutes do not otherwise violate equal protection.[8] We have previously observed that Indians in-

---

d'Alene Tribe and thus not emancipated from tribal relations. Moreover, members of tribes whose official status has been terminated by congressional enactment are no longer subject, by virtue of their status, to federal criminal jurisdiction under the Major Crimes Act. *United States* v. *Heath,* 509 F. 2d 16, 19 (CA9 1974) ("While anthropologically a Klamath Indian even after the Termination Act obviously remains an Indian, his unique status *vis-à-vis* the Federal Government no longer exists"). In addition, as enrolled tribal members, respondents were subjected to federal jurisdiction only because their crimes were committed within the confines of Indian country, as defined in 18 U. S. C. § 1151. Crimes occurring elsewhere would not be subject to exclusive federal jurisdiction. *Puyallup Tribe* v. *Department of Game,* 391 U. S. 392, 397 n. 11 (1968).

It should be noted, however, that enrollment in an official tribe has not been held to be an absolute requirement for federal jurisdiction, at least where the Indian defendant lived on the reservation and "maintained tribal relations with the Indians thereon." *Ex parte Pero,* 99 F. 2d 28, 30 (CA7 1938). See also *United States* v. *Ives,* 504 F. 2d 935, 953 (CA9 1974) (dicta). Since respondents are enrolled tribal members, we are not called on to decide whether nonenrolled Indians are subject to 18 U. S. C. § 1153, and we therefore intimate no views on the matter.

[8] Other than their argument that the federal statutes create an invidious racial classification, respondents do not seriously contend that application of federal law to Indian tribes is so irrational as to deny equal protection. See n. 11, *infra.* They do point, however, to Congress' relinquishment of criminal jurisdiction over Indians in six States pursuant to 18 U. S. C. § 1162. But § 1162 is simply one manifestation of Congress' continuing concern with the welfare of Indian tribes under federal guardianship. Indeed, in adopting § 1162, Congress singled out certain reservations to remain subject to federal criminal jurisdiction. Congress' selective approach in § 1162 reinforces, rather than undermines, the conclusion that legislation directed toward Indian tribes is a necessary and appropriate consequence of federal guardianship under the Constitution.

dicted under the Major Crimes Act enjoy the same procedural benefits and privileges as all other persons within federal jurisdiction. *Keeble* v. *United States,* 412 U. S. 205, 212 (1973). See 18 U. S. C. § 3242. Respondents were, therefore, subjected to the same body of law as any other individual, Indian or non-Indian, charged with first-degree murder committed in a federal enclave.[9] They do not, and could not, contend otherwise.

There remains, then, only the disparity between federal and Idaho law as the basis for respondents' equal protection claim.[10] Since Congress has undoubted constitutional power to prescribe a criminal code applicable in Indian country, *United States* v. *Kagama,* 118 U. S. 375 (1886), it is of no consequence that the federal scheme differs from a state criminal code otherwise applicable within the boundaries of the State

---

[9] Federal jurisdiction would extend to crimes, regardless of the race of the perpetrator or victim, committed on federal enclaves, such as military installations, or on vessels of the United States on the high seas.

Congress has provided for federal jurisdiction over the crime of murder on a reservation, much as on other federal enclaves, 18 U. S. C. §§ 1111, 1153. But as our opinions have recognized that Indian reservations differ in certain respects from other federal enclaves, the statute has been construed as not encompassing crimes on the reservation by non-Indians against non-Indians. *United States* v. *McBratney,* 104 U. S. 621 (1882); see *Surplus Trading Co.* v. *Cook,* 281 U. S. 647, 651 (1930); *Williams* v. *Lee,* 358 U. S. 217, 219–220 (1959); *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 171 (1973). Federal statutes do not single out Indians as such; non-Indian defendants are also covered if the victim was a member of the tribe.

[10] Respondents base their equal protection claim on the assumption that they have been disadvantaged by being prosecuted under federal law. In their view, their murder convictions were made more likely by the fact that federal prosecutors were not required to prove premeditation. However, they do not seriously question that the evidence adduced at their federal trial might well have supported a finding of premeditation and deliberation, since respondents were found to have beaten and kicked Mrs. Johnson to death during the course of a planned robbery.

of Idaho. Under our federal system, the National Government does not violate equal protection when its own body of law is evenhanded,[11] regardless of the laws of States with respect to the same subject matter.[12]

The ·Federal Government treated respondents in the same manner as all other persons within federal jurisdiction, pursuant to a regulatory scheme that did not erect impermissible

[11] It should be noted, however, that this Court has consistently upheld federal regulations aimed *solely* at tribal Indians, as opposed to *all* persons subject to federal jurisdiction. See, *e. g., United States* v. *Holliday,* 3 Wall. 407, 417–418 (1866); *Perrin* v. *United States,* 232 U. S. 478, 482 (1914). See also *Rosebud Sioux Tribe* v. *Kneip, ante,* at 613–615, n. 47. Indeed, the Constitution itself provides support for legislation directed specifically at the Indian tribes. See n. 6, *supra.* As the Court noted in *Morton* v. *Mancari,* the Constitution therefore "singles Indians out as a proper subject for separate legislation." 417 U. S., at 552.

In this regard, we are not concerned with instances in which Indians tried in federal court are subjected to differing penalties and burdens of proof from those applicable to non-Indians charged with the same offense. Compare *United States* v. *Big Crow,* 523 F. 2d 955 (CA8 1975), cert. denied, 424 U. S. 920 (1976), and *United States* v. *Cleveland,* 503 F. 2d 1067 (CA9 1974), with *United States* v. *Analla,* 490 F. 2d 1204 (CA10), vacated and remanded, 419 U. S. 813 (1974). See 18 U. S. C. § 1153 (1976 ed.) (which provides for uniform penalties for both Indians and non-Indians charged with assault resulting in serious bodily injury). That issue is not before us, and we intimate no views on it.

[12] Indeed, had respondents been prosecuted under state law, they may well have argued, under this Court's holding in *Seymour* v. *Superintendent,* 368 U. S. 351 (1962), that the state conviction was void for want of jurisdiction. In *Seymour,* an enrolled member of the Colville Indian Tribe was convicted in state court of attempted burglary within Indian country. In reversing the state conviction, this Court held:

"Since the burglary with which petitioner was charged occurred on property . . . within the . . . [Indian] reservation, the courts of Washington had no jurisdiction to try him for that offense." *Id.,* at 359.

If state courts would have had no jurisdiction over respondents' case, then state law does not constitute a meaningful point of reference for establishing a claim of equal protection.

racial classifications; hence, no violation of the Due Process Clause infected respondents' convictions.[13]

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

[13] If we accepted respondents' contentions, persons charged with crimes on federal military bases or other federal enclaves could demand that their federal prosecutions be governed by state law to the extent that state law was more "lenient" than federal law. The Constitution does not authorize this kind of gamesmanship. Indeed, any such rule, even assuming its workability, is flatly inconsistent with the Supremacy Clause of the Constitution, Art. VI, cl. 2..