Lawrence C. CARDINAL,
Petitioner–Appellant,

v.

UNITED STATES of America,
Respondent–Appellee.

No. 90–1291.

United States Court of Appeals,
Sixth Circuit.

Argued July 23, 1991.

Decided Jan. 16, 1992.

Lawrence C. Cardinal, pro se.

Clarence T. Belue (argued and briefed), Madison, Wis., for petitioner-appellant.

Ruth Ann Ernst (argued), Donald Daniels, Asst. U.S. Atty. (briefed), Grand Rapids, Mich., for respondent-appellee.

Before GUY and RYAN, Circuit Judges, and HULL, Chief District Judge.[*]

RALPH B. GUY, Jr., Circuit Judge.

Defendant, Lawrence C. Cardinal, was convicted of the crime of rape on an Indian reservation, in violation of 18 U.S.C. § 2031. The trial court exercised jurisdiction pursuant to the Major Crimes Act, 18 U.S.C. §§ 1151 and 1153. Cardinal subsequently filed this petition pursuant to 28 U.S.C. § 2255, seeking to have his sentence vacated or set aside on the ground that the sentencing court lacked subject matter jurisdiction over the crime of which he was convicted. Cardinal argued that federal jurisdiction did not exist because the rape he committed occurred outside the boundaries of the Keweenaw Bay Indian Reservation, on private land not within "Indian country."

In accordance with 28 U.S.C. § 636(b), the district court referred defendant's petition to a magistrate for proposed findings of fact and recommendations. The magistrate subsequently recommended that the petition be denied. The district court, after reviewing the magistrate's report and recommendation and the objections to the report filed by defendant, and upon *de novo* consideration of the issues presented, adopted the report and recommendation and denied defendant's petition for habeas corpus. Defendant appeals the decision of the district court. Finding no error in the district court's disposition of the issues raised, we affirm.

I.

Defendant, a Chippewa Indian who resided on the Keweenaw Bay Indian Reservation, was convicted for the rape of his 13-year-old niece "on and within the Keweenaw Bay Indian Reservation and within the Indian country," in Baraga County, Michigan. Defendant was sentenced to 30 years' imprisonment and his conviction was subsequently affirmed on appeal. *United States v. Cardinal*, 782 F.2d 34 (6th Cir.), *cert. denied*, 476 U.S. 1161, 106 S.Ct. 2282, 90 L.Ed.2d 724 (1986). The statute under which Cardinal was indicted, charged, and convicted provides that "[w]hoever, within the special maritime and territorial jurisdiction of the United States, commits rape shall suffer death, or imprisonment for any term of years or for life." 18 U.S.C. § 2031.[1]

The situs of the offense was an abandoned cabin known as the Delores Reynolds residence.[2] The United States alleged that the crime occurred on an Indian reservation and, thus, within the territorial jurisdiction of the United States. Jurisdiction was based on 18 U.S.C. §§ 1151 and 1153. Defendant concedes that the Major Crimes Act grants federal jurisdiction over crimes

---

[*] Honorable Thomas G. Hull, United States District Court for the Eastern District of Tennessee, sitting by designation.

1. Subsequent to defendant's indictment and conviction, 18 U.S.C. § 2031 was repealed and replaced by a similar provision at 18 U.S.C. § 2241.

2. Delores Reynolds, not the owner of the property at the time of the crime, was the preceding owner. According to her death certificate, she was Caucasian. Although it is not evident from the record whether the owner of the Reynolds property during the time of the crime was Indian or non-Indian, defendant's argument does not rely on the racial status of the property owner.

of the nature charged against him if the crime was committed within "Indian country" as defined by 18 U.S.C. § 1151, which provides in pertinent part:

> [T]he term "Indian country" ... means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

Defendant's assertion that the sentencing court lacked jurisdiction is premised upon the argument that the Reynolds property is private property not within "Indian country" as defined by 18 U.S.C. § 1151. Cardinal's position is that the Reynolds property was sold to the State of Michigan pursuant to the Canal Act of 1852, 10 Stat. 35 (1852), before the La Pointe Treaty of 1854 created the Keweenaw reservation for the Chippewas. 10 Stat. 1109. Therefore, the Reynolds property is not part of the reservation, argues defendant, and is not Indian country under 18 U.S.C. § 1151(a).

According to defendant, the Reynolds property was a part of 750,000 acres of land granted by Congress to the State of Michigan for the construction of a proposed canal on the Saint Mary's River at Sault Ste. Marie, Michigan. Section 2 of the Canal Act of 1852 provides:

> That there be, and hereby is granted to the said State of Michigan, for the purpose of aiding said State in constructing and completing said canal, seven hundred and fifty thousand acres of public lands, to be selected in subdivisions, agreeably to the United States surveys, by an agent or agents to be appointed by the Governor of said State, subject to the approval of the Secretary of the Interior, from any lands within said State, subject to private entry.

10 Stat. 35 (1852). These lands were to be used exclusively for aiding in the construction of the proposed canal. Section 2 explicitly provides that land selections must be made by agents appointed by the Governor of Michigan and that these selections must be approved by the Secretary of the Interior.

Article 2 of the La Pointe Treaty of 1854 provides:

> The United States agree to set apart and withhold from sale, for the use of the Chippewas of Lake Superior, the following described tracts of land, viz:
>
> 1st. For the L'Anse and Vieux De Sert bands, all the *unsold lands* in the following townships in the State of Michigan: Township fifty-one north range thirty-three west; township fifty-one north range thirty-two west; the east half of township fifty north range thirty-three west; the west half of township fifty north range thirty-two west, and all of township fifty-one north range thirty-one west, lying west of Huron Bay....

10 Stat. 1109 (1855) (emphasis added). The 1854 La Pointe Treaty was ratified on January 10, 1855, and proclaimed on January 29, 1855.

It is undisputed that the Reynolds property is located in township fifty-one north range thirty-three west (township 51–33). Thus, the crime occurred within the boundary of lands identified in the treaty as set aside for the use of the Chippewas. The question presented, then, is whether the Reynolds property was among "unsold lands" at the time of the 1854 treaty and, therefore, actually set aside as reservation land for the Chippewas or sold as canal lands prior to the date the treaty became effective.

In his effort to resolve this question, the magistrate reviewed the history of the L'Anse Band of the Chippewa Indians. A study of the history of the Keweenaw Bay Indian Reservation prepared by Mark Keller for the Bureau of Indian Affairs, entitled "The Canal Lands of Keweenaw Bay," was submitted by the government to the magistrate and is part of the record below. According to the Keller report, the 51–33

land selections were not approved by the Secretary of the Interior until January 24, 1855, and the patents for these lands were not delivered to the State of Michigan until May 25, 1855. Further, the Keller report contends that these lands could not be transferred by Michigan to the canal company under contract to build the canal until the canal was completed and accepted by Michigan, which occurred on May 21, 1855. Therefore, according to the Keller report, the canal lands referred to in the Canal Act of 1852 were not "sold" until May 21 or 25, 1855, after the treaty of 1854 had been ratified on January 10, 1855.[3]

The Keller report acknowledged that, although title to the 51–33 lands should have remained with the Indians, portions of these lands were nevertheless claimed by Michigan and the canal company pursuant to the Canal Act. Further, the records in the office of the Register of Deeds for Baraga County show that Michigan issued a patent for the Reynolds property to the "St. Mary's Falls Ship Canal Company" on May 25, 1855, and that all subsequent deeds to the property followed unchallenged from this patent.

Upon reviewing the magistrate's report and recommendation, which relied in part on the Keller report, the district court concluded that, even assuming the Reynolds property was canal land, canal lands were not sold prior to the effective date of the 1854 treaty and, thus, were part of the Keweenaw reservation. The district court further concluded that, to the extent that the canal lands were sold before the 1854 treaty became effective, that fact did not impact upon whether the lands were "Indian country" for the purposes of federal subject matter jurisdiction.

On appeal, the issues are: (1) whether the Reynolds property was sold prior to January 10, 1855, the effective date of the 1854 treaty, and thus not granted to the Chippewas as reservation land by the terms of that treaty; and (2) whether, assuming *arguendo* that the subject parcel had been sold prior to the effective date of the 1854 treaty, the Reynolds property is nevertheless "within the limits" of the Keweenaw reservation for purposes of section 1151 jurisdiction.

## II.

■■■ An appellate court renders *de novo* review of a habeas proceeding in the district court. *See Lundy v. Campbell,* 888 F.2d 467, 469–70 (6th Cir.1989), *cert. denied,* 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990). Although we review *de novo* Cardinal's claim that the sentencing court lacked subject matter jurisdiction over the crime of which he was convicted, we apply a clearly erroneous standard of review to any findings of fact made by the district court. *McCall v. Dutton,* 863 F.2d 454, 459 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989).

Although Cardinal maintains that the rape occurred "outside the boundaries" of the reservation because the Reynolds property is private property, we conclude that the Reynolds property is at least within the exterior boundaries of the reservation established by the treaty, as the property is in township 51–33. "Under the definition of 'Indian country' set forth in section 1151(a) of title 18, jurisdiction extends to all lands within the exterior boundaries of

---

**3.** In addition, to implement the provisions of the 1854 treaty, Keller presents documentation indicating that President Pierce signed an executive order on March 7, 1855, which stated in full:

> Let the tracts on Keweenaw and Huron Bays, in the State of Michigan and shaded in red with a blue margin on the within diagram, be reserved from sale or entry for any purpose not consistent with the stipulations of the 1st Clause of the 2nd Article of the treaty with the Chippewa Indians ratified on the 10th day of January, 1855.

According to the Keller report, the National Archives made a colored photographic slide of the diagram referred to in the executive order, which shows that all of township 51–33 was reserved for use pursuant to Article 2 of the La Pointe Treaty. This executive order accompanied a letter to the Surveyor General of Detroit on March 30, 1855, which instructed that the 51–33 lands, among others, be "withdrawn and withheld from sale or entry for any purpose whatsoever ... under the 1st clause of the 2nd Article of the treaty" of 1854.

an Indian reservation regardless of who owns the land." *United States v. Grey Bear,* 636 F.Supp. 1551, 1557 (D.N.D.1986) (citations omitted), 883 F.2d 1382 (8th Cir. 1989), *cert. denied,* 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 840 (1990).

In *Seymour v. Superintendent of Washington State Penitentiary,* the Supreme Court addressed the assertion that exclusive federal jurisdiction did not exist over a burglary committed on land held under a patent in fee by a non-Indian. 368 U.S. 351, 357, 82 S.Ct. 424, 428, 7 L.Ed.2d 346. The State of Washington contended that the limits of a reservation were "diminished by the actual purchase of land within it by non-Indians because land owned in fee by non-Indians cannot be said to be reserved for Indians." *Id.* The Supreme Court rejected this argument and reasoned:

This contention is not entirely implausible on its face and, indeed, at one time had the support of distinguished commentators on Indian Law. But the issue has since been squarely put to rest by congressional enactment of the currently prevailing definition of Indian country in § 1151 to include "all land *within the limits* of any Indian reservation under the jurisdiction of the United States Government, *notwithstanding the issuance of any patent....*"

The State urges that we interpret the words "notwithstanding the issuance of any patent" to mean only notwithstanding the issuance of any patent to an Indian. But the State does not suggest, nor can we find, any adequate justification for such an interpretation. Quite the contrary, it seems to us that the strongest argument against the exclusion of patented lands from an Indian reservation applies with equal force to patents issued to non-Indians and Indians alike. For that argument rests upon the fact that where the existence or nonexistence of an Indian reservation, and therefore the existence or nonexistence of federal jurisdiction, depends upon the ownership of particular parcels of land, law enforcement officers operating in the area will find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular

offense, even though committed within the reservation, is in the State or Federal Government. Such an impractical pattern of checkerboard jurisdiction was avoided by the plain language of § 1151 and we see no justification for adopting an unwarranted construction of that language where the result would be merely to recreate confusion Congress specifically sought to avoid.

*Seymour,* 368 U.S. at 357–58, 82 S.Ct. at 428–29 (footnotes omitted; emphasis added). Accordingly, notwithstanding the issuance of any patents to Michigan or the canal company, the Reynolds property is still land within the limits of the reservation. Therefore, the Reynolds property is "Indian country" pursuant to section 1151, and the federal courts have jurisdiction over the crime committed by Cardinal on that property.

It is possible to read the *Seymour* decision as extending federal jurisdiction over land patented to non-Indians only when that land is patented *subsequent* to the establishment of the Indian reservation. However, even assuming that the Court's concerns with checkerboard jurisdiction are to be construed narrowly and applied only to patents issued subsequent to the creation of a reservation, this does not alter our finding of jurisdiction in the instant case. We believe that the Reynolds property was "unsold lands" at the time the 1854 treaty creating the reservation became effective, and, to the extent that the Reynolds property may have been subject to conveying instruments prior to the effective date of the treaty, any such attempts to transfer the property did not operate to exclude it from the land set apart for Indian use under the treaty.

The Keller report's conclusions are persuasive and well documented regarding the status of the 51–33 lands before the La Pointe Treaty became effective on January 10, 1855. Section 2 of the Canal Act of 1852 explicitly provides that agents of Michigan must make land selections, subject to the approval of the Secretary of the Interior. The district court concluded, on the strength of the Keller report, that the

lands selected in township 51–33 were not approved by the Secretary of the Interior until January 24, 1855, and the patents for these lands were not delivered to the State of Michigan until May 25, 1855. These findings are not clearly erroneous, and we are without any evidence controverting these findings. Accordingly, we affirm the finding that the canal lands referred to in the Canal Act of 1852 were not "sold" before the treaty of 1854 was ratified on January 10, 1855.

Principles of federal Indian law also support the finding that the Chippewas were not legally dispossessed of the land in question prior to the effective date of the La Pointe Treaty. The "discovery rule" articulated by Chief Justice Marshall in *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), holds that colonial conquest gives exclusive title to those in possession of land through discovery. Because this rule of conquest was adopted by competing European nations and because Indians native to America were not a party to the agreement, the discovering nations held title subject to the Indian rights of occupancy. Although Indians may occupy the land, Marshall theorized that discovery gave the United States the exclusive power to extinguish aboriginal title and convey fee title to someone else. The only limitation on the extinguishment of native title was that it could occur only through express acts of Congress, and typically has occurred through treaty or congressional statute. Until the federal government extinguished aboriginal title, only the Indians themselves could legitimately occupy or use Indian lands. In fact, without fee simple title, and because only the sovereign has the power to convey the land, aboriginal occupants were powerless to convey legal title to any but the federal government. *McIntosh*, 21 U.S. at 591 n. 5.

Extinguishment of aboriginal title usually has taken the form of acquiring large tracts of land in exchange for money and "recognition" of a permanent property right in a smaller tract of land, usually referred to as a "reservation" owned and governed by a tribal entity. The first treaty or congressional act relating to Indian rights of occupancy in the area of the 51–33 lands was the treaty with the Chippewas, concluded in October 1842 and proclaimed in March 1843. 7 Stat. 591. This treaty ceded to the United States a large tract of land between Lake Superior and the Mississippi. It recited that the country between these two waters had always been understood as belonging in common to the Chippewas, and that the Indians retained the right of occupancy on the ceded territory until required to leave it by the President of the United States.

Since the treaty of 1842 provided for continued occupancy of lands by Indians and Indian removal from the "mineral district" at the pleasure of the President, this treaty has been interpreted as pertaining to the sale of minerals, not land. *Keweenaw Bay Indian Community v. Michigan*, M87–278–CA2 (W.D.Mich. Nov. 14, 1989). The Indians were not removed from the lands, no executive order requiring their removal was made, and no change took place in their occupancy until the treaty of 1854. *See United States v. Thomas*, 151 U.S. 577, 582, 14 S.Ct. 426, 428, 38 L.Ed. 276 (1894). Pursuant to the treaty of 1854, provision was made for the formation of permanent reservations, which were "to be, as near as possible, in a compact form, except so far as the meandered lakes were concerned." *Id.*

Upon review of the preceding history, it would appear that no part of the 51–33 lands could have been legally conveyed to non-Indians prior to the treaty of 1854 because native title in the land had never been expressly extinguished by Congress— the treaty expressly providing for the continued Indian right of occupancy. *See Thomas*, 151 U.S. at 583, 14 S.Ct. at 428. Thus, although the Chippewas' possessory interest in the land was subject to surrender by act of the President, because no such act was forthcoming prior to the 1854 treaty, the Indians retained their possessory interest in the 51–33 lands even though portions of these lands were claimed by Michigan and the canal company following the Canal Act of 1852. The Canal Act granted to Michigan lands that were "sub-

ject to private entry," and where the Indians held the right of occupancy no others could legitimately enter, occupy, or use Indian lands. By authority of the Chippewa right of occupancy, which could be extinguished only through an express act of Congress, any title that vested in the state or the canal company and any patent that may have been issued prior to the treaty of 1854 was subordinate to the right of occupation of the Indians. *See id.* at 584–85, 14 S.Ct. at 428–29; *Keweenaw Bay*, slip op. at 10.

In the absence of any proof that prior to January 1855 the Indians surrendered their right of occupancy or Congress expressly extinguished that right with respect to the Reynolds property or any other property within the limits of township 51–33, we conclude that all of township 51–33 was set aside as a part of the Keweenaw reservation.[4] Accordingly, the Reynolds property was within "Indian country" as defined by 18 U.S.C. § 1151, and the sentencing court had jurisdiction over the crime charged against Cardinal. The decision of the district court denying Cardinal's petition for habeas corpus is AFFIRMED.

HULL, Chief District Judge, concurring.

I concur with the results of the majority opinion, but for the following reasons.

By 1848, a survey of the upper peninsula area around Keweenaw Bay had been completed. On August 26, 1852, the Canal Act was passed providing that 750,000 acres of public lands were to be granted to the State of Michigan

> to be selected in subdivisions, agreeably to the United States surveys, by an agent or agents *to be appointed* by the governor of said state, *subject to* the approval of the secretary of interior, *from any lands within said state,* subject to private entry.

(Emphasis added). This Act was clearly nonself-executing, and therefore did not

have the full force and effect of law, because further action was not only required of the State of Michigan, but also by the federal government. *Man Hing Ivory & Imports, Inc. v. Deukmejian,* 702 F.2d 760 (9th Cir.1983). In other words, the land to be given to the State of Michigan had not been identified with any certainty at this point, any land selected had to be done so by a particular procedure, and any land so selected was still subject to approval by the Secretary of Interior.

Beginning in April of 1853, Receiver Brown began to make canal land selections. In September of 1853, Register Butler gave a deposition indicating that he never saw a properly signed or sealed document that gave Mr. Brown the authority to select canal lands. Only the governor could appoint land agents for the canal company to select lands. However, the Secretary of the Interior sided with Brown.

Then, on September 30, 1854, the La Pointe Treaty was drafted. This treaty was self-executing because land areas were spelled out with specificity, and no further domestic action was required. *Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 252, 104 S.Ct. 1776, 1782, 80 L.Ed.2d 273 (1984).

On January 10, 1855, township 51–33 land selections were approved by the Secretary of Interior for the canal. However, patents for the land were not issued, because the contract for the canal still had to be approved by the State of Michigan. Therefore, domestic action was still pending before this Act could take full force and effect.

The La Pointe Treaty of 1854 was proclaimed on January 29, 1855, and therefore, became effective on that date. As of March 7, 1855, a map was completed showing tracts which were shaded in red and blue that included all of township 51–33. On this same date, an Executive Order was issued identifying these tracts as reserved for Indian use under the treaty with the Chippewa Indians, as was ratified on Janu-

---

**4.** Further, the defendant presents no evidence of congressional intent to disestablish any portions of the Keweenaw reservation since the treaty of 1854. "[W]hen Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress." *United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 95, 54 L.Ed. 195 (1909).

ary 10, 1855. Subsequently, on March 30, 1855, this Executive Order accompanied a letter which was sent to the Surveyor General which specifically instructed that the 51–33 lands be "withdrawn and withheld from sale or entry for any purpose whatsoever." Other named townships were not exempted in whole or in part.

Nearly two months later, on May 21, 1855, the Governor of Michigan approved the contract to build the canal, which was the necessary domestic action that had to be taken for the Canal Act to go into full force and effect.

In spite of the Executive Order and letter, between May 21–25, 1855, patents for the canal land which included township 51–33 were delivered to the State of Michigan. On May 25, 1855, Michigan issued a patent to St. Mary's Falls Ship Company for the Reynolds property contained in township 51–33.

Because township 51–33 became reservation property as of at least January 25, 1855, and because the Canal Act could not have the effect of law until all necessary domestic action was completed on May 21, 1855, this patent to township 51–33 was issued in error, and the Reynolds property should be designated as reservation land.

For the above reasons, I concur in the results of the majority opinion.