85 F.3d 629
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES, Plaintiff-Appellee,
v.
James Darrell HOLT, Defendant-Appellant.
 No. 95-5173.
 United States Court of Appeals, Sixth Circuit.
 May 15, 1996.
 
 Before: JONES, BOGGS, and COLE, Circuit Judges.
 PER CURIAM:
 
 
 1
 James Darrell Holt appeals from the denial of his petition for a writ of habeas corpus, under 28 U.S.C. § 2255, following his conviction of a federal crime, claiming ineffective assistance of counsel stemming from an actual conflict of interest. We affirm.
 
 
 2
 * The pre-habeas facts recited here are taken in large part from the Sixth Circuit's opinion in James Darrell Holt's direct appeal. See United States v. Holt, 980 F.2d 731, 1992 WL 340935 (6th Cir.1992) (unpublished).
 
 
 3
 James Darrell Holt, the appellant in this case, was indicted on February 20, 1990 along with his uncle, Michael David Holt, and his grandparents, William Cleveland Holt and Edna Marie Holt, on three counts of violating 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2, for conspiring to distribute and for possession with intent to distribute various quantities of marijuana and cocaine. Events leading up to the indictment began when Theo Leonard Hoskins and his son, Ronnie Hoskins, were arrested by the FBI while attempting to deliver cocaine. The Hoskinses became informants who revealed to the FBI that James Darrell Holt and Michael Holt were the suppliers for their cocaine. Theo Hoskins told the FBI that he had given Michael Holt an army ammunition box with a red top in which to store cocaine. Ronnie Hoskins told the FBI that he had seen Michael Holt go into the woods near his parents' house on Mud Creek near Mud Lick, Kentucky, and return a few minutes later with cocaine.[1]
 
 
 4
 Using the Hoskinses, the FBI attempted to set up a buy from the Holts, but neither James Darrell Holt nor Michael Holt were home at the time. Instead, an agent discovered a green army ammunition canister with an orange lid hidden beneath a log in a rocky crevice in the woods about 60 feet away from the Holt home. Inside the can, the FBI found a brown paper bag containing three plastic bags of cocaine. A previous panel of this court summarized the analyses of the paper bag, plastic bags, and tin foil by the Fingerprint Division of the FBI's Identification Division in Washington, D.C.:
 
 
 5
 The Fingerprint Section sent three reports to the local FBI office in Louisville. The first, dated October 13, 1989, said that no latent prints of value were found on any of the three plastic bags. The second, dated October 16, 1989, said that one latent fingerprint and five latent palm prints had been developed on the paper bag; that the fingerprint had been identified as James Darrell Holt's; and that no palm prints of James Darrell Holt were available in the Fingerprint Section's files, so "major case prints" of James Darrell Holt should be forwarded to Washington.
 
 
 6
 The local FBI office forwarded Holt's palm prints as requested, along with fingerprints and palm prints from eight other suspects. The Fingerprint Section then issued a third report, dated December 18, 1989, stating that one of the latent palm prints found on the paper bag had been identified as that of James Darrell Holt. The report went on to say that "[t]he latent fingerprint and latent impression previously reported in this case are not fingerprints of James Darrell Holt or the other eight persons."
 
 
 7
 Id., 1992 WL 340935 at ** 1. So, to summarize, the first report found no prints of any kind on the plastic bags; the second report found one latent fingerprint of James Darrell Holt's on the paper bag; and the third report found that the second report was incorrect, but that one of latent palm prints on the paper bag was James Darrell Holt's.[2]
 
 
 8
 The government dismissed the indictment against William and Edna Holt, but proceeded to trial against James Darrell Holt and Michael Holt on November 12, 1991. On November 15, 1991, the jury returned a verdict of not guilty against Michael Holt. A mistrial was declared as to one of the three counts on which James Darrell Holt was charged. James Darrell Holt was also found not guilty of one count. He was, however, convicted on one count. James Darrell Holt was sentenced on January 31, 1992, to eight years and one month of imprisonment, to be followed by a 5-year term of supervised release.
 
 
 9
 James Darrell Holt challenged on direct appeal the district court's decision to admit the palm print evidence from the third FBI report because copies of the prints had not been provided to him prior to trial, which he contended violates Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Bagley, 473 U.S. 667 (1985) (plurality) (due process violation not to disclose evidence that could be used to impeach government witnesses if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different). Our court on direct review concluded that the district court did not abuse its discretion in admitting this evidence because James Darrell Holt knew well in advance of trial that his palm print had been matched with the palm print on the brown paper bag, because James Darrell Holt was not challenging the validity of the match, and because his counsel had made the tactical decision to argue to the jury that the four unidentified palm prints on the paper bag cast doubt on his client's guilt. The court held that James Darrell Holt's defense would have been no different if he had obtained copies of the prints from the government. Judge Keith dissented, arguing that copies of the prints James Darrell Holt requested might have been used to illuminate further the inconsistencies in the government's reports and impeach the FBI's fingerprint expert. Holt, 1992 WL 340935 at ** 2-** 4.
 
 
 10
 Using Judge Keith's dissenting opinion, James Darrell Holt argued in a federal habeas petition that he was provided ineffective assistance of counsel at trial in a number of respects. Most significantly for the purposes of this appeal, James Darrell Holt argued that his attorney had a conflict of interest because James Darrell Holt's uncle, Michael Holt, paid James Darrell Holt's attorneys fees. This conflict allegedly manifested itself in his attorney's failure to hire a fingerprint expert and his attorney's failure to discuss with James Darrell Holt the possibility of cooperating with the government.
 
 
 11
 An evidentiary hearing was held before Magistrate Judge Todd on April 26, 1994. James Darrell Holt's trial attorney, Lowell Lundy, testified that Michael Holt did pay his legal fees, but that this fact did not influence his representation of James. He admitted that the fee arrangement had been negotiated while James Darrell Holt stood out in the hall during a meeting Lundy had with Michael Holt and Gary Crabtree, Michael Holt's attorney. Lundy also testified that he talked with James Darrell Holt before trial. Lundy admitted the importance of the palm print evidence against James Darrell Holt in securing the conviction against him, but maintained that he never intended to challenge the validity of the FBI report that found James Darrell Holt's palm print was on the paper bag because he had never seen such an attempt succeed. His only hope was to use a fingerprint expert to determine who the remaining four palm prints belonged to and parade them before the jury, saying that the cocaine could just as easily have belonged to any of them.
 
 
 12
 Depending on how Lundy's decision not to hire a fingerprint expert is viewed, this decision may have created a kind of "Catch-22" for his client, James Darrell Holt. Lundy stated at the hearing that he did not hire a fingerprint expert because he did not have anything to show such an expert. But, the district court would not use its discretion under Fed.R.Crim.P. 16(a)(1)(C) to impose sanctions against the government for its failure to turn over copies of the prints found on the paper bag because Lundy did not have an expert immediately available to examine the prints when and if they were made available to the defense. Lundy admitted that the district court had told him that he had "sort of laid over in the weeds." Lundy claimed, however, that the reason why the district judge thought he was lying in the weeds was because the court did not understand the fact that while the defense had access to the paper bag, it needed copies of the prints themselves because there was nothing left on the bag to analyze once the FBI had completed its print-lifting process. Lundy was, however, caught in a contradiction about his motivation for not hiring a fingerprint expert. He had represented to the district judge at sentencing that he could not have afforded to hire an expert. But at the hearing before Magistrate Judge Todd, Lundy maintained that if he had obtained copies of the prints from the government, "somebody in the Holt family could have probably ponied up the money" to hire a fingerprint expert.
 
 
 13
 Lundy also explained that he did not consider the possibility of talking to the government about entering into a plea agreement because this would have required James Darrell Holt to testify against his uncle, and he believed that James Darrell Holt "would probably have died and gone to hell before he'd testify against his uncle...."
 
 
 14
 Magistrate Judge Todd concluded in a report styled "Proposed Findings of Fact with Recommendation" that there was no factual basis to support a finding of an actual conflict of interest that may have affected Lundy's performance as James Darrell Holt's defense counsel because the evidence clearly showed that none of the four unidentified prints belonged to Michael Holt. He also proposed finding that Lundy's failure to hire a fingerprint expert was not motivated by a desire to help Michael Holt since Michael was paying James Darrell Holt's attorneys fees. Magistrate Judge Todd also credited trial testimony from James's step-mother, Sandra Holt, stating that James worshipped his uncle and thought his uncle "could do no wrong." Magistrate Judge Todd concluded that James Darrell Holt's own claim that he would have considered making a deal with the government was self-serving and not credible because James Darrell Holt prefaced this testimony with "[i]f I'd known what I know now...."--a statement that establishes that James would not in fact have considered pleading guilty, given what he actually knew at the relevant time. Magistrate Judge Todd did conclude, however, that Lundy had been remiss in failing to argue for a downward departure under USSG § 4A1.3 p.s. (departure permitted when a defendant's criminal history category overstates the seriousness of his criminal history or the likelihood of future criminal activity) at sentencing. Holt filed timely objections to the report.
 
 
 15
 Upon de novo review of Magistrate Judge Todd's recommendations and proposed findings of fact, the district court adopted those recommendations and proposed findings of fact and set James Darrell Holt's case for resentencing. Holt was resentenced to the lowest term of imprisonment under the applicable Guideline range, shaving one year and seven months from his original sentence at the absolute top of the applicable Guideline range. The district court, however, did not grant Holt the downward departure Holt's trial counsel was allegedly deficient for not arguing for under § 4A1.3 p.s. Holt's timely appeal followed.
 
 
 16
 II. REVIEW OF FINDINGS OF FACT FOR CLEAR ERROR
 
 
 17
 A district court's findings of fact in habeas cases are reviewed for clear error. Cardinal v. United States, 954 F.2d 359, 362 (6th Cir.1992). The district court's findings of fact with respect to Lundy's motivation for not discussing the possibility of a plea agreement with the government are not clearly erroneous. James Darrell Holt points to no facts in the record to support his argument that Lundy was in fact motivated by a desire to help Michael Holt. Lundy did not ask James Darrell Holt about the possibility of pleading guilty because this would have required James to testify against his uncle. And there was evidence in the record to support the conclusion that James would not have testified against his uncle. The district court could obviously have decided to credit this evidence as opposed to James Darrell Holt's self-serving claim that he would have considered making a deal with the government. However, it is important to note that the district court did not make any findings of fact with respect to James Darrell Holt's argument that he would have pled guilty without testifying against his uncle in order to obtain an acceptance of responsibility sentencing reduction, if only he had been presented with this option, because James Darrell Holt's habeas counsel did not make this argument to the district court.
 
 
 18
 The question of whether the district court correctly appraised Lundy's motives for not hiring a fingerprint expert is more difficult, however. The district court did not address the apparent contradiction between Lundy's claim at sentencing that he did not hire the expert because he could not afford to do so and his claim in the habeas hearing that he did not hire the expert because the expert would have had no prints to examine. (Of course, both statements could be true, although the second seems superfluous if the funds to hire an expert were truly lacking.[3] ) Moreover, it did not address Lundy's contradiction in stating at the habeas evidentiary hearing that Holt's family may have been able to afford to hire an expert. While Lundy's equivocations on this point should have been addressed by the district court in its opinion, they are not very troubling to this court. The district court heard the contradictions, yet nevertheless decided to accept the justification Lundy offered to explain his decision.
 
 
 19
 One way to explain the contradiction in Lundy's testimony is that Lundy was trying to evoke the most sympathy possible for his client at sentencing by misrepresenting the financial ability of his client and client's family. If this is true, the contradiction over whether sufficient funds existed to hire an expert establishes that Lundy may have violated his duty as an officer of the court to speak truthfully at all times, but it does not establish that he was acting out of a desire to help Michael Holt. Indeed, he could not have been acting from such a desire, as the district court pointed out, because there was clear evidence that none of the prints on the paper bag belonged to Michael Holt. Nor would it be justifiable to draw an inference in this case that Lundy did not initially decide to avoid hiring a fingerprint expert in order to protect Michael before he knew whether Michael's prints were on the bag. This is because Lundy went back and forth with the government and the court about obtaining the prints for a long enough period of time that he could easily have revised an initial decision to protect Michael Holt once he learned Michael Holt had nothing to fear from that initial course of action. The fact that an expert was never hired, even after Lundy knew that Michael's interest would not be threatened by the results, supports the conclusion that, in representing James Darrell Holt, Lundy was never acting to protect Michael in the Holts' joint prosecution.
 
 
 20
 Despite stating at one point that "Michael David Holt's prints were not on the bag," James Darrell Holt's counsel on habeas suggests, by innuendo, that the unidentified prints might have belonged to Michael Holt:
 
 
 21
 With respect to the fingerprint expert, Michael David Holt's interests and James Darrell Holt's interests diverged. James Darrell Holt, whose palmprint became the focal point of the trial, needed a fingerprint expert to (a) contest the identification of the palmprint (b) challenge the conflicting fingerprint and palmprint reports and (c) identify the rest of the prints. In stark contrast, Michael David Holt, whose prints were not identified, was satisfied with the status quo.
 
 
 22
 This passage subtly suggests that Michael Holt's prints may have been found on the same bag if only an expert had been hired. Again, there is no evidence to support this assertion. Moreover, it is not true that Michael David Holt's interests were divergent from James Darrell Holt's on the points that James's habeas counsel asserts. Each of the purported benefits that counsel claims would have flowed to James could equally have flowed to Michael Holt. It is clear, as the district court found, that Michael Holt's prints were not found on the paper bag. But, it must also be remembered that Michael Holt was indicted for participating in a conspiracy to distribute marijuana and cocaine. The presence of his nephew's fingerprint on a paper bag containing cocaine in the woods a short distance from his parent's home obviously made it more likely that Michael Holt was involved in such a conspiracy because his nephew was alleged by the government to be a co-conspirator.
 
 
 23
 Moreover, actually hiring an investigator rather than simply promising to hire one could have had the effect of hurting both James Darrell Holt and Michael Holt. Lundy never thought it would be possible to challenge the FBI's conclusion that James Darrell Holt's palm print was on the paper bag. Given this, it might have made tactical sense not to hire a defense expert to examine the finger prints, but merely threaten to hire one. Such an expert would have been expensive and would probably have done no more than confirm the results put forward by the FBI. As matters actually stood during the trial, Lundy was able to get great mileage out of the conflicting FBI print reports and argue that the unidentified prints could have belonged to others who actually owned the cocaine found in the bag. Also, if an expert had been at the ready, the district court might have actually used its discretion to compel the government to produce copies of the prints found on the bag for analysis. And it may have been tactically correct for Lundy to have decided that this would have been harmful to both James Darrell Holt and Michael Holt because these defendants would then have lost grounds for appeal that were obviously weighty enough to convince at least one judge on our court that an error of constitutional magnitude had occurred when the government failed to turn over the prints to the defense. In short, Lundy's strategy may have been to use the threat of hiring a fingerprint expert as his Sword of Damocles at the trial level by creating doubt in front of the jury and, if that failed, making a potentially strong argument on appeal for a violation of due process on the basis that the government had not turned over potentially impeaching evidence. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." O'Hara v. Wigginton, 24 F.3d 823, 828 (6th Cir.1994) (quoting Strickland v. Washington, 466 U.S. 668, 690 (1984)).
 
 III. ACTUAL CONFLICT OF INTEREST
 
 24
 This court reviews de novo the district court's conclusion that the facts of this case did not constitute an actual conflict of interest and therefore did not constitute ineffective assistance of counsel. United States v. Hopkins, 43 F.3d 1116, 1118 (6th Cir.), cert. denied, 115 S.Ct. 2017 (1995) (calling actual conflict of interest determination a mixed question of fact and law subject to de novo review).
 
 
 25
 The Sixth Amendment guarantees the right to effective assistance of counsel. Strickland, 466 U.S. at 686. The general Strickland test requires showing both that defective performance of counsel occurred and that such performance affected the outcome of the proceeding being collaterally challenged. Id. at 687. The existence of an actual conflict of interest on the part of defense counsel in a criminal trial renders that counsel constitutionally deficient. "We consider in this type of case [only]: (1) whether there is an actual conflict of interest and (2) whether that conflict has caused ineffective performance in violation of the Sixth Amendment." United States v. Boling, 869 F.2d 965, 971 (6th Cir.1989). If an actual conflict of interest cannot be demonstrated, then prejudice rising to the level that the outcome of the proceeding was affected (the second part of the Strickland test) will no longer be presumed. Cuyler v. Sullivan, 446 U.S. 335, 348-50 (1980).
 
 
 26
 The defendant bears the burden of establishing that both parts of the Boling test are met. United States v. Garcia, 19 F.3d 1123, 1126 (6th Cir.1994), citing Taylor v. United States, 985 F.2d 844 (6th Cir.1993). To meet the first part of the test, the defendant must point to specific examples where the allegedly conflicted counsel made a choice that was harmful to the defendant and helpful to the source of the conflict. Id. at 971-72. In the context of this case, James Darrell Holt must point to specific examples of Lundy making choices that hurt James Darrell Holt but helped his uncle, Michael.
 
 
 27
 Given the district court's factual finding that James Darrell Holt would not have entertained the concept of pleading guilty and testifying against his uncle, it is clear that Lundy did not make a harmful choice in failing to discuss with James the possibility of pleading guilty and cooperating with the government against his uncle. A counsel with a potential conflict of interest need not present the client with an option that counsel knows the client will reject, even though, if the clients would have actually chosen that option, the failure to have presented it would have constituted an actual conflict of interest.
 
 
 28
 James Darrell Holt is unable to make a related argument on appeal because he did not raise it with specificity below--that he was denied effective assistance of counsel because, while he may not have testified against his uncle, he could have simply pled guilty and perhaps gotten an acceptance of responsibility sentencing reduction, if only he had known of this option. Even assuming that this failure had the requisite harmful effect on James Darrell Holt, his claim for an actual conflict of interest on this basis must fail. First, the argument has been waived by failure to make it below. Second, this argument cannot support an actual conflict of interest because if James Darrell Holt had pled guilty without implicating his uncle, then claimed an acceptance of responsibility reduction, this course of action would not have harmed his uncle, Michael.
 
 
 29
 Lundy's decision not to hire a fingerprint expert was also not a conflict of interest, as the decision to hire such an expert would not have hurt Michael Holt. In fact, a decision to hire a fingerprint expert may have harmed both Michael and James Darrell Holt. Counsel does not become enmeshed in an actual conflict of interest by making a tactical decision that certainly could not hurt the individual who is the source of the alleged conflict and could arguably have hurt both the source of the alleged conflict and the counsel's primary client.
 
 
 30
 In connection with his actual conflict of interest claim, James Darrell Holt argues that Lundy could not satisfactorily explain to the magistrate judge why one lawyer did not represent both him and his uncle. (Michael Holt obtained separate representation for himself at trial.) James Darrell Holt then contends that his uncle's payment of Lundy's fees somehow violates Fed.R.Crim.P. 44(c). However, Rule 44(c) only requires the district court to inform defendants with the same attorney that they may engage separate representation. As there already were separate attorneys for James and Michael at trial, there was no need under Rule 44(c) for the district court to inquire into any potential conflict of interest. Lundy's inability to explain the reason for separate representation is immaterial and certainly does not implicate Rule 44(c).
 
 
 31
 IV. NO REASONABLE PROBABILITY OF DIFFERENT OUTCOME HAD LUNDY
 
 MADE DIFFERENT DECISIONS
 
 32
 No actual conflict of interest has been shown in this case. Thus, the court must treat this case as an ordinary claim for ineffective assistance of counsel where the inquiry is two-fold: (1) whether counsel's performance was deficient according to professional norms; and (2) whether, but for counsel's deficient performance, there is a reasonable probability that the outcome at trial would have been different. Here, because it is dispositive, the court need only address the second part of the test.
 
 
 33
 James Darrell Holt makes two arguments that Lundy's two contested decisions had a reasonable probability of altering the outcome of the trial. First, James claims that the loss of an option to plead and cooperate with the government constitutes ineffective assistance of counsel. Of course, James did not lose such an option because it is not clearly erroneous for the district court to have concluded that he never would have exercised such an option if it had been presented to him. All of the authority James cites to support his argument on this score is distinguishable. In United States v. Day, 969 F.2d 39 (3d Cir.1992), the Third Circuit concluded that counsel's failure to explain to a defendant that he might be sentenced as a career offender, which caused the defendant to reject a government plea offer, supported a claim for ineffective assistance of counsel. James, however, is not arguing that he rejected a plea actually tendered by the government based on deficient information provided by Lundy. United States v. Thompson, 27 F.3d 671 (D.C.Cir.1994), involved a similar claim, but the District of Columbia Circuit rejected it on the merits because the defendant had not shown a reasonable probability that he would have either attempted to strike a plea bargain when the government had not offered him one, and because there was no evidence that such a plea, even if offered, would have led to his being given a lower base offense level for sentencing purposes. Finally, in United States v. Busse, 814 F.Supp. 760 (E.D.Wis.1993), a district court accepted an argument based on Day where counsel had given faulty advice to his client about a plea agreement actually in existence.
 
 
 34
 Among Day, Thompson, and Busse, this case is most like Thompson, where the defendant could not show a reasonable probability either of being offered a plea agreement, or of getting one favorable enough to have made a dent in the sentence he otherwise would have received. James Darrell Holt cannot show a reasonable probability that he would have permitted Lundy to begin plea negotiations with the government that would have involved testifying against his uncle, even if Lundy had presented him with such an option.
 
 
 35
 James Darrell Holt's claim that Lundy failed to inform him that he could plead guilty without implicating his uncle in order to claim an acceptance of responsibility reduction at sentencing constituted ineffective assistance of counsel, again, has been waived because it was not specifically made below. Nevertheless, the claim does not meet the reasonable probability test. It is true that James Darrell Holt was acquitted on a conspiracy count and the jury rejected an aiding and abetting theory for the count James Darrell Holt was actually convicted of. However, James Darrell Holt was charged with both conspiracy and aiding and abetting. Acceptance of responsibility under USSG § 3E1.1 requires "truthfully admitting the conduct comprising the offense(s) of conviction." USSG § 3E1.1 comment. (n. 1). Here, if James Darrell Holt had pleaded guilty, the offenses of conviction would have been all of the offenses with which he was charged in the indictment. When one is charged with conspiracy, it is necessary to disclose the criminal conduct of others involved in the same conspiracy because the relevant "offense" is not an isolated act, but a congeries of acts--a criminal synergy. Covering for fellow conspirators is part of the crime of conspiracy, and therefore James Darrell Holt does not admit to his own role in a conspiracy unless he reveals what he knows about others involved in the same conspiracy. Construing § 3E1.1 in this way serves the vital policy function of placing the maximum pressure on conspirators to turn over their co-conspirators, and thus, it discourages conspiracies. Reading § 3E1.1 in any other way would allow co-conspirators to shield each other and still gain a sentencing reduction for acceptance of responsibility.
 
 
 36
 Second, James's claim for ineffective assistance based on Lundy's failure to hire a fingerprint expert must fail because he cannot show a reasonable probability that a different result would have obtained at trial. As discussed above, the failure to call a fingerprint expert in this case was most likely a tactical decision. See also Hernandez v. Wainwright, 634 F.Supp. 241, 248 (S.D.Fla.1986), aff'd, 813 F.2d 409 (11th Cir.1987), where a district court rejected an ineffective assistance of counsel claim based on the failure to call an expert fingerprint witness because such a claim required unguided speculation into the value of omitted testimony by hypothetical witnesses.
 
 
 37
 James's claim that he was denied effective assistance of counsel is undercut by the fact that Lundy managed to win acquittal on two of the three counts of the indictment against James, and to frame an appeal in which James Darrell Holt's conviction was affirmed only over a forceful dissent. It is likely that James Darrell Holt received excellent representation from Lundy, but even if he did not, there was no actual conflict of interest in this case and no showing by James of a reasonable probability that Lundy's alleged errors had any effect on the outcome of his trial or sentencing.
 
 V
 
 38
 James Darrell Holt's petition for a writ of habeas corpus was properly denied, as he cannot demonstrate either that his counsel had an actual conflict of interest or that he otherwise received ineffective assistance of counsel. The district court's order is AFFIRMED.
 
 
 
 [1]
 Lowell Lundy, James Darrell Holt's trial attorney, described the Hoskinses as "a little thick," "kind of dense fellows" during Holt's habeas hearing. Holt did not choose to challenge his conviction on the basis of possible flaws in the Hoskinses' testimony, however. Nor did he choose to bring his habeas petition on this basis. Therefore, the "denseness" of the Hoskinses is irrelevant to the outcome of this appeal
 
 
 [2]
 Magistrate Judge Todd, in his review of the evidence on habeas, pointed out that the FBI's expert testified at trial that while the third report seemed to say that the second had been in error, this was only the impression given when reading the reports in juxtaposition. The FBI expert testified that another report existed, but he could not provide a copy of it:
 We are talking about two different fingerprints. The [second] report came out, and the fingerprint that was developed on the brown paper bag was conclusively compared and identified as the fingerprint of James Holt. From that point further, this print was not compared with anyone else. There is a report missing in there, in which a latent--additional latent fingerprint was developed and had something to do with a different individual.
 Thus, if the jury credited this FBI's fingerprint expert's testimony, it could have concluded that the second report and third reports taken together established that the FBI found two of James Darrell Holt's prints on the paper bag.
 
 
 [3]
 Also, the lack of funds may not have been a barrier to obtaining expert assistance, as it is sometimes possible for indigent defendants to obtain such assistance under the Criminal Justice Act. See 18 U.S.C. § 3006A(e)(1)